# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| JOSEPH PHILLIPS and PATRICK CHIN on Behalf of Themselves and All Others Similarly Situated, and | ) ) ) | Case No.: 1:18-cv-00541-TSB |
| | ) | Judge Timothy S. Black |
| GREATER CINCINNATI HOMELESS COALITION, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| CITY OF CINCINNATI, and | ) ) | |
| JOHN J. CRANLEY, CITY MAYOR, | ) ) ) | **THIRD AMENDED CLASS-ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DEMAND FOR JURY** |
| Defendants. | ) ) | **TRIAL** |

Plaintiffs Joseph Phillips, Patrick Chin, and the Greater Cincinnati Homeless Coalition, on behalf of themselves and all others similarly situated, for their third-amended Complaint state:

## PRELIMINARY STATEMENT

1. This amended Complaint comes in an attempt to enjoin the Defendants from enforcing Policy 12.111, "Police Interaction with Homeless Encampments" ("Policy 12.111"),[1] from detaining or arresting citizens experiencing homelessness, and from seizing or destroying their property.

2. This amended Complaint comes also in an attempt to enjoin enforcement of the permanent injunction issued August 16, 2018 by the Hamilton County Court of Common Pleas in the matter of *State of Ohio v. City of Cincinnati*, case number A1804285 ("Case A1804285").[2]

---

[1] *See* Exhibit A: "Police Interaction with Homeless Encampments."
[2] *See* Exhibit B: "Judgment Entry, Order, and Permanent Injunction," entered August 16, 2018.

3.  This amended Complaint adds two plaintiffs Patrick T. Chin and the Greater Cincinnati Homeless Coalition ("Coalition").

4.  This amended Complaint adds City Mayor John J. Cranley as a defendant and removes as defendants Hamilton County, Ohio, Hamilton County Prosecutor Joseph T. Deters, the Hamilton County Court of Common Pleas, and Judge Robert P. Ruehlman.

5.  This amended Complaint removes the Rule 23(b)(3) class allegations contained in paragraphs 46 and 47 of the Second Amended Class-Action Complaint (Doc. #16).

6.  This amended Complaint alleges additional facts, specifically in paragraphs 26 to 46, which address shelter space availability; paragraphs 47, which refers to affidavits provided by shelter directors and outreach workers; and paragraph 48, which refers to shelter rules and regulations.

7.  This amended Complaint revises the class definition to include citizens experiencing homelessness in Hamilton County as well as the City of Cincinnati.

8.  In paragraphs 94(f), 94(g), and 94(h), this amended Complaint raises additional questions of law and fact common to the putative class.

9.  This amended Complaint supplements Count Three to include a substantive Due-Process claim.

10. This amended Complaint includes an additional legal claim of sham legal process (Count Eleven).

11. Finally, this amended Complaint modifies Plaintiffs' prayer for relief to include monetary damages for lost and or destroyed property.

## PARTIES

12. Plaintiff Joseph Phillips was at all times relevant to this Complaint, a citizen of Hamilton County and a resident of the City of Cincinnati.[3]

13. Plaintiff Patrick Chin is, and was at all times relevant to this Complaint, a citizen of Hamilton County and a resident of the City of Cincinnati.[4]

14. Plaintiff Greater Cincinnati Homeless Coalition is a non-profit organization engaged in coordinating services, educating the public, and advocating on behalf of citizens experiencing homelessness all of whom are members of the Coalition.[5]

15. The City of Cincinnati is a municipal corporation organized under the laws of the State of Ohio.

16. The City Mayor is the official representative of the City for all purposes except as provided in the City charter.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this dispute, pursuant to 28 U.S.C. § 1331, because Plaintiffs' cause of action arises under the Constitution and laws of the United States.

18. This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

19. This Court is the proper venue pursuant to 28 U.S.C. § 1391(b) because this Court sits in the district where the Defendants are domiciled, and because this Court sits in the district where a substantial part of the acts and omissions relevant to Plaintiffs' claims arose.

---

[3] *See* Exhibit C: Affidavit of Plaintiff Joseph Phillips, dated August 8, 2018.
[4] *See* Exhibit D: Affidavit of Plaintiff Patrick T. Chin, dated November 1, 2018.
[5] *See* Exhibit E: Affidavit of Greater Cincinnati Homeless Coalition Executive Director Joshua Spring.

## FACTS

20. According to 2017 data compiled by the United States Department of Housing and Urban Development, the City has approximately 7,740 citizens who will experience homelessness during a calendar year, of whom 1,775 are children.[6]

21. Men make up approximately 65 percent of the homeless population, while women make up approximately 35 percent of the homeless population.  Sixty-one percent of the City's homeless people are black, 34 percent are white, and four percent are multiracial or of other races and ethnicities.[7]

22. Nine tenths of one percent (0.9 percent) of the City's fiscal year 2018 General Fund budget was devoted to combatting homelessness and providing social services to its homeless citizens. One half of one percent (0.5 percent) of the City's fiscal year 2019 General Fund budget is devoted to combatting homelessness and providing social services to its homeless citizens.

23. The City has a dozen public restrooms, none of which include shower facilities, and none of which are open 24 hours.

24. The City has approximately 16,000 affordable homes and apartments, with approximately 56,000 people in need of affordable housing.  That is, for every 100 of the lowest income households in Hamilton County, there are only 28 units of housing that are both affordable and available, resulting in an affordable housing shortage of approximately 40,000 units.[8]

25. All 11 shelters in Hamilton County are located in the City, and those shelters are unable to accommodate all its homeless citizens due to lack of space.

---

[6] *See* Exhibit F: "HUD 2017 Continuum of Care Homeless Assistance Programs Homeless Populations and Subpopulations." (However, that figure does not reflect the actual number of homeless people because it reflects a "point in time count" one night of the year, and many people cannot be found so as to be included in the count.)
[7] *See* Id.
[8] *See* Exhibit G: "Housing Affordability in Hamilton County," dated February 2017.

26. The County has a Central Access Point (CAP) phoneline that individuals and families in need of shelter may call to determine whether shelters space is available. CAP call-in data is reported to the Department of Housing and Urban Development (HUD) on a daily basis.

27. On an average day in January 2018, CAP received 15.45 calls on behalf of 45.41 people in need of family shelter, 26.82 of whom were children. Of those people, 82.88 percent were denied access to shelter due to lack of space, 1.20 percent were deemed ineligible, and only 14.31 percent of people were placed in a family shelter.[9]

28. On an average day in January 2018, 7.36 people called the CAP hotline in need of shelter for an individual. Of those people, 41.36 percent were denied access due to lack of space, 0.23 percent were deemed ineligible for individual shelter, and only 46.91 percent were placed in a shelter.[10]

29. On an average day in February 2018, CAP received 13.60 calls on behalf of 38.15 people in need of family shelter, 23.20 of whom were children. Of those people, 84.27 percent were denied access due to lack of space, 1.18 percent were deemed ineligible, and only 14.29 percent of people were placed in a family shelter.[11]

30. On an average day in February 2018, 11.20 people called the CAP hotline in need of individual shelter. Of those people, 37.50 percent were denied access to due to lack of space, 35.71 percent were told contact a shelter directly, and only 25 percent were placed in a shelter for individuals.[12]

---

[9] *See* Exhibit H: Daily Averages from the Cincinnati/Hamilton County Continuum of Care for the Homeless (CoC) Housing Inventory Count (HIC) as reported to the Department of Housing and Urban Development, at 1-3.
[10] *See* Id.
[11] *See* Exhibit H, at 4-6.
[12] *See* Id.

31. On an average day in March 2018, CAP received 11.32 calls on behalf of 34 people in need of family shelter, 20.68 of whom were children. Of those people, 79.81 percent were denied access due to lack of space, 0.13 percent were deemed ineligible, and only 19.12 percent were placed in a family shelter.[13]

32. On an average day in March 2018, 10.09 people called the CAP hotline in need of shelter for individual. Of those people, 48.65 percent were denied access due to lack of space, 0.05 percent were deemed ineligible, 37.39 percent were told contact a shelter directly, and only 13.06 percent of callers were placed in an individual shelter.[14]

33. On an average day in April 2018, CAP received 17.43 calls on behalf of 50.62 people in need of family shelter, 30.10 of whom were children. Of those people, 84.85 percent were denied access due to lack of space, 0.09 percent were deemed ineligible, and only 13.64 percent of callers were placed in a family shelter.[15]

34. On an average day in April 2018, 9.86 people called the CAP hotline in need of shelter for an individual. Of those people, 42.03 percent were denied access due to lack of space, 33.82 percent of people were told contact a shelter directly, and only 21.74 percent of callers were placed in a shelter for individuals.[16]

35. On an average day in May 2018, CAP received 21.91 calls on behalf of 65.43 people in need of family shelter, 39.22 of whom were children. Of those people, 90.37 percent were denied access due to lack of space, 0.07 percent were deemed ineligible, and only 8.7 percent of people were placed in a family shelter.[17]

---

[13] *See* Exhibit H, at 7-9.
[14] *See* Id.
[15] *See* Exhibit H, at 10-12.
[16] *See* Exhibit H, at 10-12.
[17] *See* Exhibit H, at 13-15.

36. On an average day in May 2018, 9.87 people called the CAP hotline in need of shelter for an individual. Of those people, 41.85percent were denied access due to lack of space, 45.81percent of people were told to contact a shelter directly, and only 10.57 percent of people were placed in a shelter for individuals.[18]

37. On an average day in June 2018, CAP received 27.48 calls on behalf of 76.19 people in need of family shelter, 43 of whom were children. Of those people, 96.06 percent were denied access due to lack of space, and only 2.69 percent of people were placed in a family shelter.[19]

38. On an average day in June 2018, 15.14 people called the CAP hotline in need of shelter for an individual. Of those people, 50 percent were denied access due to lack of space, 39.62 percent were told to contact a shelter directly, and only 8.81 percent of people were placed in a shelter for individuals.[20]

39. On an average day in July 2018, CAP received 21 calls on behalf of 70 people in need of family shelter, 42.5 of whom were children. Of those people, 88.05 percent were denied access to due to lack of space, 0.13 percent were deemed ineligible, and only 10.19 percent of people were placed in a family shelter.[21]

40. On an average day in July 2018, 21.14 people called the CAP hotline in need of shelter for an individual. Of those people, 58.71percent were denied access due to lack of space, 27.1 percent were told to contact a shelter directly, and only 12.69 percent of people were placed in a shelter for individuals.[22]

---

[18] *See* Id.
[19] *See* Exhibit H, at 16-18.
[20] *See* Id.
[21] *See* Exhibit H, at 19-21.
[22] *See* Id.

41. On an average day in August 2018, CAP received 26.7 calls on behalf 93.96 people in need of family shelter, 58.74 of whom were children. Of those people, 94.82 percent were denied access due to lack of space, and only 3.75 percent were placed in a family shelter.[23]

42. On an average day in August 2018, 23.78 people called the CAP hotline in need of shelter for an individual. Of those people, 72.76 percent were denied access due to lack of space, 16.64 percent were told to contact a shelter directly, and only 6.76 percent were placed in a shelter for individuals.[24]

43. On an average day in September 2018, CAP received 21.75 calls on behalf of 76.25 people in need of family shelter, 46.90 of whom were children. Of those people, 93.90 percent were denied access due to lack of space, and only 5.18 percent of people were placed in a family shelter.[25]

44. On an average day in September 2018, 14.30 people called the CAP hotline in need of shelter for an individual. Of those people, 81.82 percent were denied access due to lack of space, 8.39 percent of people were told to contact a shelter directly, and only 5.94 percent of people were placed in a shelter for individuals.[26]

45. On an average day between October 1 and October 28, 2018, CAP received 23.25 calls on behalf 80 people in need of family shelter, 50.65 of whom were children. Of those people, 93.88 percent were denied access due to lack of space, and only 4.81 percent were placed in a family shelter.[27]

46. On an average day between October 1 and October 28, 2018, 13.75 people called the CAP hotline in need of shelter for an individual. Of those people, 69.82 percent were denied access due

---

[23] *See* Exhibit H, at 22-24.
[24] *See* Id.
[25] *See* Exhibit H, at 25-27.
[26] *See* Id.
[27] *See* Exhibit H, at 28-30.

to lack of space, 15.63 percent were told to contact a shelter directly, and only 6.18 percent of people were placed in a shelter for individuals.[28]

47. The County is without enough permanent supportive housing ("PSH"), the County's shelters regularly turn people away for lack of space, and the number of people turned away is well below the actual number of people in need of shelter.[29]

48. Notwithstanding the availability of shelter space, or the lack thereof, each shelter has rules and regulations that might prevent Plaintiffs, and putative class members, from accessing that shelter space. For example, the St. Francis-St. Joseph Catholic Worker House ("Catholic Worker House") requires that clients get a job within two weeks of arrival and save 65 percent of their earnings. Failing to do so results in removal, and anyone who has stayed at Catholic Worker House cannot return for a minimum of six months after his previous exit date. If one has been there three times before, one cannot return for a minimum of three years from the prior exit date and with staff approval. Anyone with four total stays can never return.

49. For years, people have been living on Cincinnati's Third Street in tents and other makeshift shelters (the "Third Street Camp").

50. For the past year, up to 40 people have been living along Cincinnati's Fort Washington Way in tents and other makeshift shelters (the "Fort Washington Camp").

51. Plaintiff Joseph Phillips has lived in Cincinnati 18 years and has lived at the Third Street Camp two-and-a-half months. It has been 10 years since Mr. Phillips had indoor shelter. He has accessed one of the City's shelters, but he was kicked out for a minor rules violation[30] and has not

---

[28] *See* Id.
[29] *See* Exhibit H; *see also* Exhibit I: Affidavits from Lydia's House, Caracole, Homeless Clearinghouse, Interfaith Hospitality Network, and Over-the-Rhine Community Housing.
[30] Mr. Phillips violated the shelter's curfew rules because he was hospitalized overnight. He presented the shelter with documentation of his hospital stay, but he was nonetheless denied access.

been allowed back.  Forced to live outside, Mr. Phillips chose to live at the Third Street Camp because, being well traveled and well lit, it is the safest place he could find shelter.  He has sheltered at upwards of 100 different outside locations, but he has had to abandon those locations because police officers forced him to move or be arrested.  Mr. Phillips earns a living working odd jobs he gets by way of a temporary-hire agency.  In the past, Mr. Phillips has worked as a roofer, concrete finisher, painter, construction laborer, for Amazon.com, McDonalds, KFC, and several others in the food service industry.[31]

52. Plaintiff Patrick Chin was born and raised in Cincinnati, Ohio and has been a permanent resident of Hamilton County since 2016.  It has been three years since Mr. Chin had indoor shelter, and he has lived at various outside locations including the Third Street Camp and Fort Washington Camp.  Circa July 27, 2018, Mr. Chin's property was destroyed and or seized by the City when it forcibly removed those living at the Fort Washington Camp.[32]

53. The Greater Cincinnati Homeless Coalition ("Coalition") is a social action agency whose mission is to end homelessness. The Coalition works towards this goal by coordinating services, educating the public, and engaging in grassroots organizing and advocacy.  The Coalition's efforts are primarily focused in Hamilton County and the City of Cincinnati.[33]

54. All Hamilton County residents experiencing homelessness are members of the Coalition including those evicted from the Third Street Camp and Fort Washington Camp.  The Coalition has found it increasingly difficult to serve its members since August 2018 when the Hamilton County Court of Common Pleas issued TROs in Case A1804285.[34]

---

[31] *See* Exhibit C.
[32] *See* Exhibit D.  Based on information and belief, video exists of the City destroying and or seizing his property.
[33] *See* Exhibit E: Affidavit of Greater Cincinnati Homeless Coalition Executive Director Joshua Spring.
[34] *See* Id.

55. Under Ohio Revised Code (R.C.) § 2911.21, any person who knowingly enters or remains on the land or premises of another, without the privilege to do so, can be charged with criminal trespass. It is no defense that the land or premises is owned, controlled, or in the custody of a public entity.

56. The City cites and arrests citizens experiencing homeless for criminal trespass on public property pursuant to R.C. § 2911.21.[35]

57. The booking process for citizens experiencing homelessness lasts approximately three to four hours. The court sets the next court date after the arrestee leaves the courthouse, and because the arrestee is without a mailing address, they never receive notice of their next date to appear. As a result, the arrestee fails to appear, and the court issues an arrest warrant.

58. At the start of their shift, law enforcement officers review the list of arrest warrants issued that day, and the same group of officers who recognize certain names as belonging to citizens experiencing homelessness scour the City looking for the subjects and making the arrests.

59. A citizen experiencing homelessness is not likely to be arrested at their place of abode. Instead, the arrest is executed on the sidewalk or in a public park, and while in police custody the arrestee's property remains where it is stashed or hidden.

60. When a citizen experiencing homelessness is arrested at their place of abode, their shelter, blankets, and other belongings are seized or discarded as trash.

61. Law enforcement officers are paid $100 for each court appearance related to these arrests.

62. On July 27, 2018, the City threatened with arrest the citizens living in the Fort Washington Camp and then destroyed their property, without regard for whether it was *bona fide* trash, in violation of Policy 12.111.[36]

---

[35] *See* Exhibit J: "Trespass Warning," dated July 26, 2018.
[36] *See* Exhibit A.

11

63. On July 30, the City's mayor said, "'Allowing activists to organize homeless camps in public rights-of-way poses a direct threat to public health and safety for those staying in encampments, and people who visit and work near these areas... This is a public health emergency and we are required to respond in a way that ensures safety.'"[37]

64. On July 31, 2018, the City posted and distributed notices in and around the Third Street Camp advising that the "area will be closed for cleaning and maintenance on Friday, August 3, 2018 from 2pm until work is completed."[38]  The notice advised the reader to vacate the area, and that any personal property left behind would be considered abandoned.

65. On August 3, 2018, this Court held a hearing regarding the motion for TRO Plaintiff Phillips filed that morning.  After the hearing, Plaintiff Phillips's motion was denied in part because the Court found the City has "a compelling interest to clean and maintain public property," since "[a]fter the City [was] done cleaning the area, Plaintiffs and other individuals residing at the Third Street Camp [would] be permitted to return," and in part because [t]he two hours that the City require[d] to clean the Third Street Camp [was] a very narrow state action to achieve this compelling interest."[39]

66. To comply with this Court's Order, residents of the Third Street Camp began removing their belongings in order for the City to clean, and at approximately 2:00 p.m. cleanup efforts began.  Police were present but did not become involved.  The City gathered no evidence of human waste in or near the camp, nor did the City gather evidence of illegal drug use.  By 4:00 p.m., the cleanup was all-but completed, and most of the residents had returned to their respective campsite.

---

[37] *See* Exhibit K: "City Gives Third Street Homeless Camp 72 Hours to Vacate"
(http://www.fox19.com/story/38771299/downtown-homeless-camp-sends-list-of-demands-to-city).
[38] *See* Exhibit L.
[39] *See* Doc. #4.

67. Also on August 3, 2018, Defendant Mayor John J. Cranley released a statement indicating he had "asked for and [] obtained the assistance of Hamilton County Prosecutor Joe Deters," and that "Prosecutor Deters [would] be filing actions in state court."[40]  The mayor "thank[ed] Prosecutor Deters for his help in [the] matter," and pledged that "[t]ogether [they would] continue to pursue all strategies" to prevent residents from reconstituting their camp elsewhere within the City.[41]

68.  To that end, on August 6, 2018, the Hamilton County prosecutor filed a complaint against the City in the Court of Common Pleas alleging that "these encampments are violating numerous laws of the State of Ohio.  In particular, ORC 2911.21, Criminal Trespass; ORC 5589.01 Obstructing Public Grounds; and ORC 2925 felony and misdemeanor drug offenses."[42]  The complaint demanded the Court adjudge "the activity currently being permitted in the area of the City of Cincinnati South of Central Parkway to the Ohio River [] a nuisance as defined by Ohio Revised Code § 3719.10 and the public nuisance law."[43]

69. The prosecutor's complaint was supported by an affidavit from Cincinnati Police Captain Michael Neville who averred to being "inundated" with "numerous complaints" regarding the Third Street Camp.[44]  No such complaints were attached to his affidavit, nor was any documentation of complaints attached to his affidavit.

70. The prosecutor's complaint was supported also by an affidavit from Kelly Carr, assistant to the city manager.  In her affidavit, Ms. Carr averred to the receipt of "photographs provided by the Cincinnati Police Department demonstrating the pervasive abuse of alcohol at the homeless

---

[40] *See* Exhibit M: "Homeless Lose Battle to Keep Third Street Camp – Sort of"
(https://www.wlwt.com/article/homeless-lose-battle-to-keep-third-street-camp-sort-of/22630920).
[41] *See* Id.
[42] *See* Exhibit N: "Verified Petition with Affidavits Attached," filed August 6, 2018.
[43] *See* Id., at 2.
[44] *See* Exhibit N: Affidavit of Captain Michael Neville, at 35 ¶6.

encampment along Third Street."[45]  Ms. Carr also averred to the receipt of reports from the City's Health Department and Police Department regarding unsanitary conditions and used syringes in the Third Street Camp.[46]  No such photographs or reports were attached to Ms. Carr's affidavit.

71. Finally, the prosecutor's complaint was supported by an affidavit from Interim Health Commission Marilyn Crumpton, MD, MPH in which she averred to numerous risks and concerns regarding citizens experiencing homelessness.[47]  Nowhere in her affidavit does Ms. Crumpton assert that those risks and concerns are present among the Third Street Camp, only that those risks and concerns "would be applicable to" the Third Street Camp.[48]

72. Based on these affidavits, for purposes of adjudging and declaring the Plaintiffs and putative class members dangerous and harmful to the health and safety of the community and a nuisance *per se* pursuant to R.C. § 3719.10, the Court found the prosecutor had established that "[t]he encampments have a general reputation for chronic felony drug use occurring there."[49]

73. Based on those findings, the Court ordered encampments south of Central Parkway to the Ohio River "cleared through any lawful means including arrest," that all items remaining on the premises be stored or discarded, and ordered that the County Sheriff or Cincinnati Police Department issue a copy of the Court's order to anyone sheltered south of Central Parkway to the Ohio River.[50]

74. In response to the Court's Order, beginning at approximately 9:00 p.m. on August 6, residents at the Third Street Camp began dismantling their shelters and packing their belongings.

---

[45] *See* Exhibit N: Affidavit of Kelly Carr, at 31 ¶10.
[46] *See* Exhibit N: Affidavit of Kelly Carr, at 31 ¶13.
[47] *See* Exhibit N: Affidavit of Marilyn Crumpton, MD, MPH, at 18.
[48] *See* Exhibit N: Affidavit of Marilyn Crumpton, MD, MPH, at 18 ¶10.
[49] *See* Exhibit O, paragraphs 1-6.
[50] *See* Exhibit O, at 3.

Before sunrise on August 7, all residents had relocated north of Central Parkway in compliance with the Court's order.

75. To establish the authority to remove residents now encamped north of Central Parkway, on August 7 the Court of Common Pleas granted the County prosecutor's motion to amend the area covered by its earlier TRO "to include the additional area between I-71 and I-75 on the East and West and St. Route 562 on the North."[51]

76. In response to the Court of Common Pleas' amended order, on August 7 Plaintiff Phillips filed a second motion for TRO (Doc. #7).

77. After a hearing on the motion, this Court denied Phillips' second request for a TRO in part based on its finding that Phillips' failed to show by clear and convincing evidence that he is likely to prevail on his Eight Amendment claim that to arrest someone experiencing homelessness, when the City lacks shelter space, constitutes cruel and unusual punishment.

78. Having failed to enjoin Defendants from enforcing the Common Pleas Court order, on August 9, 2018, camp residents relocated to Gilbert Avenue because it was outside the area covered by the amended TRO.

79. That same day, the Court of Common Pleas issued a second amended Order to "include the entire geographic area of Hamilton County, Ohio" that would "only be enforced so long as there is shelter space available."[52]  That night, shortly before 10:00 p.m., Cincinnati Police officers forced the relocated residents to evacuate their Gilbert Avenue campsite under threat of arrest for trespassing in a public park that closed at 10:00 p.m. even though no such notice was posted in the area.

---

[51] *See* Exhibit P: Amended Temporary Restraining Order, entered August 7, 2018.
[52] *See* Exhibit Q: Second Amended Temporary Restraining Order, copy of entry filed August 9, 2018.

80. To avoid arrest and destruction or loss of their property, residents packed their belongings and relocated to privately-owned land on the corner of 13th Street and Republic Avenue.

81. Shortly thereafter, Defendant Mayor Cranley released a statement threatening to arrest those encamped on 13th and Republic notwithstanding their location on privately-owned land.[53]

82. On August 16, Defendants Hamilton County Prosecutor and City Solicitor filed a joint motion to make permanent the second amended Order covering the entire geographic area of Hamilton County, Ohio.[54]

83. On or around August 16, camp residents agreed with the landowner to vacate the corner of 13th and Republic by August 20, 2018 knowing that anyone who failed to leave was subject to arrest by Cincinnati Police or the Hamilton County Sheriff.

84. On August 20, to avoid arrest and destruction or loss of their property, residents packed their belongings and vacated the corner of 13th Street and Republic Avenue.

85. Since August 20, Plaintiffs Phillips and Chin, as well as other Homeless Coalition members, have refrained from exercising their First Amendment right to speak in a public forum in that they have refrained from erecting tents and other structures open and obvious to the public for fear of arrest and or loss of property.

86. As of this filing, Plaintiffs Phillips and Chin remain homeless.

87. Since August 6, 2018, Plaintiff Greater Cincinnati Homeless Coalition's members have suffered psychic trauma and physical injury due to the Defendants' conduct, specifically in Case A1804285.[55]

---

[53] *See* Exhibit R: "Homeless Have Until Monday to Vacate Over-the-Rhine Camp"
(https://www.wlwt.com/article/homeless-have-until-monday-to-vacate-over-the-rhine-camp/22750318).
[54] *See* Exhibit S: "Motion for Permanent Injunction Based Upon Judgment Entry and Order Endorsed By the Relator and Respondent" with "Second Amended Temporary Restraining Order" attached, filed August 16, 2018.
[55] *See* Exhibit E: Affidavit of Greater Cincinnati Homeless Coalition Executive Director Joshua Spring.

88. As of this filing, Plaintiff Greater Cincinnati Homeless Coalition remains unable to effectively serve its members due to the Defendants' conduct, specifically in Case A1804285.

## CLASS ALLEGATIONS

89. Plaintiffs Joseph Phillips and Patrick Chin bring this action, on behalf of themselves and all others similarly situated, under Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs seeks to represent the following class:

> All people residing in the City of Cincinnati and Hamilton County who (1) have lost or will lose their home and experience homelessness, or will be without fixed nighttime shelter of their own; and (2) have been warned, cited, or arrested pursuant to R.C. §§ 2911.21, 2925, 3719.10, 3729.05, 3729.14, 3767, or 5589.01 or are subject to arrest pursuant to the permanent injunction issued in Hamilton County Court of Common Pleas case A1804285.

90. Specifically, this action is brought under Rule 23(a)(1)-(a)(4) and Rule 23(b)(1) and (2).

**The Putative Class Satisfies Rule 23(a) in That It Is Impracticable to Join Thousands of People All of Whom Seek to Avoid Loss of Liberty and Property Due Their Experiencing Homelessness.**

91. Members of the putative class are so numerous that joinder is impracticable. Approximately 7,740 of Cincinnati's citizens will experience homelessness this year, an unknown number have been cited or arrested for criminal trespass on public property, and approximately 30-35 received actual or constructive notice to vacate Third Street.

92. Joinder is also impracticable in that the putative class is fluid, with people potentially entering or exiting the class on a daily basis.  Monitoring these changes, and joining and dismissing plaintiffs on an ongoing basis, would not be a practical way to manage this litigation.

93. The relief sought is common to all putative members of the class in that all seek relief from the Defendants' enforcement of Ohio's criminal statutes with respect to their status as citizens experiencing homelessness.

94. This action involves common questions of law and fact:

17

a. Does the Defendants' application of Ohio criminal law to citizens sleeping in public places violate their constitutional right to travel, free speech, privacy, due process, and or equal protection?

b. Does forcibly removing someone sheltered on public property, under threat of fine, jail, and or seizure of personal belongings, without providing alternative shelter that complies with Ohio and federal law a form of cruel and unusual punishment?

c. Does residing in an encampment in a traditionally public forum constitute symbolic political speech?

d. If residing in an encampment on public property constitutes symbolic political speech, does one have a First Amendment right to enter or remain on that property notwithstanding R.C. § 2911.21(A) and (B)?

e. Does City policy number 12.111, "Police Interaction with Homeless Encampments," violate the constitutional rights of its citizens, or violate the rights guaranteed to its citizens by any other state or federal law?

f. Did the Defendants' conduct in obtaining a court order constitute gross negligence in violation of R.C. 2744.03(A)(5)(6)?

g. Did the Defendants' conduct in obtaining a court order constitute an interference with civil rights in violation of R.C. 2921.45?

h. Did the Defendants' conspire to obtain a court order by way of sham legal process in violation of R.C. §§ 2921.45, 2921.52, and or 2744.03(A)(5)(6)?

95. The named Plaintiffs' claims are typical of the putative class members' claims in that their claims arise from the same course of conduct, namely the Defendants' use of Ohio's criminal statutes to remove and or arrest homeless citizens sleeping, residing, or remaining on public land.

96. The named Plaintiffs adequately represent the putative class in that all share the same interest in remaining free from harassment, threats, abuse, fine, arrest, imprisonment, and or loss of property at the hands of the City police or County sheriff for sleeping, residing, or remaining on public land.

97. The named Plaintiffs are familiar with the City's ordinances and conduct challenged in this action, and are prepared to respond to discovery requests.  The named Plaintiffs are committed to

18

fulfilling the role and duties of a class representative who seeks to protect the constitutional rights of citizens experiencing homeless.

98. The named Plaintiffs and the putative class are represented by Cook & Logothetis, LLC. Affidavits from Plaintiffs' counsel describing their qualifications will be submitted with the motion for class certification.

99. The named Plaintiffs and their attorneys will fairly and adequately protect the interests of the putative class.

> **The Putative Class Satisfies Rule 23(b)(1) in that Litigating Separate Actions by Individual Class Members Would Be Dispositive of the Interests of All Other Class Members.**

100. The putative class satisfies Rule 23(b)(1)(B) in that the answer to the common questions of law and fact listed above will be dispositive as to whether Plaintiffs possess the rights they seek to enforce by way of this action, and whether the Defendants' acts and omissions violated the rights Plaintiffs seek to enforce by way of this action.

> **The Putative Class Satisfies Rule 23(b)(2) in that the Defendants' Enforcement of Ohio Law is Generally Applicable to the Entire Class.**

101. Class action is appropriate in that the Defendants acted, and refused to act, on grounds generally applicable to the class by using, or threatening to use, Ohio law to remove putative class members from public spaces and or arrest them for no other reason than that they are experiencing homelessness.

102. Class action is appropriate in that the injunctive and declaratory relief sought for each claim would be applicable and appropriate to the class as a whole.

<u>**CLAIMS FOR RELIEF**</u>

**Count One:**
**Right to Free Speech**
**(42 U.S.C. § 1983 and First Amendment)**

Plaintiffs incorporate all previous paragraphs and allegations as if fully rewritten here and further state as follows.

103.     Sidewalks are traditionally public forums in which political speech can be regulated only by narrowly-tailored, content-neutral time, place, and manner regulations that leave open ample means of alternative communication.

104.     By living on Third Street, along Fort Washington Way, or anywhere open and obvious to other members of the public, Plaintiffs and putative class members are engaged in symbolic political speech calling attention to the City's affordable housing crisis.

105.     Because Plaintiffs and putative class members are engaged in symbolic political speech calling attention to the City's affordable housing crisis, they have not only the privilege but the right to remain on land owned, controlled, or in the custody of the City pursuant to R.C. § 2911.21(A) and (B).

106.     Because Plaintiffs and putative class members are engaged in symbolic political speech calling attention to the City's affordable housing crisis, the City's attempt to remove them because their speech makes the City look bad, is a content-based restriction that violates their First Amendment right to speak in a traditionally public forum.

107.     Removing and or arresting Plaintiffs and the putative class members because their speech makes the City look bad is not a compelling government interest.

108.     Removing and or arresting Plaintiffs and the putative class members because they pose a potential public-health risk is not a compelling government interest absent any evidence of an actual public health risk.  Even if a public health risk existed, dispersing those afflicted to areas where they cannot be found is not a response that ensures safety.

109.     The Defendants' conduct was intended to silence speech with which it disagrees, and to insulate the City's more fortunate citizens from feelings of shame and guilt engendered by the Plaintiffs' speech. Removing Plaintiffs, and others similarly situated, is not the least restrictive means of achieving this less-than compelling interest.

110.     In the absence of the injunctive relief sought, Plaintiffs and the putative class will either refrain from protected speech, or be cited and arrested in violation of their First Amendment right to free speech in a traditionally public forum.

**Count Two:**
**Unreasonable Search and Seizure**
**(42 U.S.C. § 1983 and Fourth Amendment)**

Plaintiffs incorporate all previous paragraphs and allegations as if fully rewritten here and further state as follows.

111.     The Fourth Amendment protects Plaintiffs, and putative class members, from unreasonable search and seizure of their person and their property.

112.     Policy 12.111 allows police officers to search and or seize homeless citizens based solely on their presence in public space or on public property.

113.     It is unreasonable to search and seize, or to threaten to search and seize, persons and their property based solely on their presence in a public space or on public property, or based solely on their status as citizens experiencing homelessness.

114.     It is unreasonable to search and seize, or to threaten to search and seize, persons and their property based on a policy that is unconstitutional.

115.     In the absence of the injunctive relief sought, Plaintiffs and putative class members will be arrested and have their property seized, or will face the threat of arrest and property seizure, without reasonable suspicion of a crime in violation of the Fourth Amendment.

**Count Three:**
**Due Process**
**(42 U.S.C. § 1983, Fifth Amendment, and Fourteenth Amendment)**

Plaintiffs incorporate all previous paragraphs and allegations as if fully rewritten here and further state as follows.

116.     Plaintiffs and putative class members have a protected interest in their property under the Due Process Clause of the Fifth and Fourteenth Amendments to the U.S. Constitution.

117.     Due process requires that the City provide Plaintiffs with sufficient pre-deprivation and post-deprivation notice that their property will be taken or has been taken, and an adequate opportunity to reclaim the property before it is destroyed.

118.     Due process requires that the City preserve the personal property of individuals arrested and taken into custody.

119.     The City has failed to provide sufficient pre-deprivation and post-deprivation notice, and has failed to preserve Plaintiffs' and putative class members' personal property, in violation of their right to due process.

120.     Without adequate shelter for all its citizens experiencing homelessness, the City arrests some while allowing others to go free in an arbitrary and capricious exercise of authority that so shocks the conscience no amount of pre-deprivation or post-deprivation process is sufficient to protect the constitutional rights of those affected.

121.     Absent the injunctive relief sought, the Defendants will continue failing to provide sufficient notice, and will continue failing to preserve Plaintiffs' and putative class members' personal property in violation of their right to due process.

**Count Four:**
**Cruel and Unusual Punishment**
**(42 U.S.C. § 1983 and Eighth Amendment)**

Plaintiffs incorporates all previous paragraphs and allegations as if fully rewritten here and further state as follows.

122.     Whether to shelter oneself is not an option.  Shelter is a basic human need, it is harmless, and to construct one's own shelter is an act inextricably linked to homelessness.

123.     The County has only 11 shelters for approximately 7,740 citizens who will experience homelessness in a given year, and there are never enough beds for everyone in need.

124.     The County does not have any shelters.

125.     The City and County have an affordable housing shortage of approximately 40,000 units.

126.     There is not enough shelter space for all citizens experiencing homelessness south of Central Parkway to the Ohio River.  There is not enough shelter space for all citizens experiencing homelessness between I-71 and I-75 on the East and West and St. Route 562 on the North.  There is nowhere near enough shelter space for all citizens experiencing homelessness throughout Hamilton County.

127.     Notwithstanding the availability of shelter space, or the lack thereof, each shelter has rules and regulations that might prevent Plaintiffs, and putative class members, from accessing that shelter leaving no sleeping space practically available in any shelter.

128.     In a municipality without enough affordable housing or enough shelters, it is cruel and unusual to search, seize, arrest, or imprison someone solely because they are homeless.

129.      Without the injunctive relief sought, Plaintiffs and others similarly situated will be ticketed, arrested, and faced with 30 days in jail for no other reason than that they are experiencing homelessness.

**Count Five:**
**Equal Protection**
**(42 U.S.C. § 1983 and Fourteenth Amendment)**

Plaintiffs incorporates all previous paragraphs and allegations as if fully rewritten here and further state as follows.

130.     Under the Fourteenth Amendment, no state shall deny to any person within its jurisdiction equal protection of the law.

131.     The City's black homeless population outnumbers its white homeless population by almost two to one.

132.     The Defendants' conduct at issue in this case disparately impacts its black citizens, homeless or not, in violation of their Fourteenth Amendment right to equal protection of the law.

133.     Absent the injunctive relief sought, Plaintiff Phillips and putative class members will continue to suffer violations of their Fourteenth Amendment right to equal protection of the law.

**Count Six**
**Right to Travel**
**(Privileges and Immunities Clause)**

Plaintiffs incorporate all previous paragraphs and allegations as if fully rewritten here and further state as follows.

134.     As far back as 1823, freedom of movement has been judicially recognized as a fundamental Constitutional right under the Privileges and Immunities Clause of the U.S. Constitution.

135.     Laws unconstitutionally penalize travel if they deny someone a "necessity of life."

136.     The Defendants' practice of citing and or arresting Plaintiffs and putative class members for sleeping in public spaces violates their fundamental right to travel by denying them the necessity of a safe place to sleep, rest, and recuperate.

137.     Absent injunctive relief, the Defendants will continue citing and or arresting people in violation of their fundamental constitutional right to travel.

**Count Seven**
**Americans With Disabilities Act**
**(42 U.S.C. 12101 *et seq.*)**

Plaintiffs incorporate all previous paragraphs and allegations as if fully rewritten here and further state as follows.

138.     Title II of the Americans With Disabilities Act ("ADA") provides in pertinent part: "[N]o qualified individual with a disability shall, by reason of such disability, be … denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

139.      At all times relevant to this action, Defendants, their employees, and their agents were public entities within the meaning of Title II of the ADA and provided programs or services to the general public including Plaintiffs.

140.      At all times relevant to this action, members of Plaintiff Greater Cincinnati Homeless Coalition, and members of the putative class, were qualified individuals with one or more disabilities within the meaning of Title II of the ADA and met the essential eligibility requirements under Title II.

141.      Defendants' policies and practices in arresting and imprisoning Plaintiffs and seizing and destroying Plaintiffs' and putative class members' blankets, tents, and other protective

gear and medications violated their rights on the basis of their disabilities in violation of 28 C.F.R. § 35.130(b)(3).

142.    The acts and omissions of the Defendants, their agents, and their employees subjected Plaintiffs and putative class members to discrimination on the basis of their disabilities by destroying their property, and by storing any remaining items following the unlawful seizures in a way that was inaccessible and unreasonable.

143.    Defendants knew, or should have known, that the incidence of disabilities for people experiencing homelessness is high, with estimates at more than one in two homeless individuals suffering from some significant cognitive, psychological, medical, or physical disability, and many suffering from compound disabilities or co-morbid conditions.

144.    Defendants knew, or should have known, that Plaintiffs and putative class members have mental and or physical health issues that interfere with their daily living and prevent them from doing such things as maintaining employment or obtaining affordable housing on their own.

145.    As a public entity, Defendants are required to "make reasonable modifications in policies, practices, or procedures when such are necessary to avoid discrimination on the basis of disability" where, as here, modifications would not "fundamentally alter the nature of the service, program or activity." 28 C.F.R. § 35.130(b)(7).

146.    Defendants' duty under 28 C.F.R. § 35.130(b)(7) includes the duty to make reasonable accommodations to preserve the essential life-protecting property of persons experiencing homelessness, as well as to provide prompt and reasonable access to storage facilities to ensure that individuals are able to recover seized property, and to provide accessible transportation to and from any storage facility.

147.     The policies, practices, and procedures challenged in this action, even if otherwise facially neutral, unduly burden persons who are without shelter and within the federal definition of "disabled" and "homeless."

148.     Defendants committed the acts and omissions alleged herein with intent and or reckless disregard for the rights of the Plaintiffs and putative class members.

149.     Defendants and their agents and employees have failed to adopt ADA-compliant policies and procedures for interacting with citizens with disabilities who are experiencing homelessness.

150.     As a result of Defendants' acts and omissions, Plaintiffs have suffered injury to their constitutional rights, their persons and property and are entitled to compensatory damages, damages pursuant to the ADA, and attorneys' fees and costs.

**Count Eight**
**State-Created Danger**
**(42 U.S.C. § 1983, Fifth Amendment, and Fourteenth Amendment)**

Plaintiffs incorporate all previous paragraphs and allegations as if fully rewritten here and further state as follows.

151.     Defendants knew, or should have known, that many of its citizens experiencing homelessness have significant health risks exacerbated by living without adequate protection from the elements.

152.     By threating to take and destroy Plaintiffs' and the putative class' tents, tarps, blankets, and clothing, and by ordering Plaintiffs and the putative class members to vacate public land, Defendants have created a danger for the Plaintiffs by exposing them to harsh weather elements.

27

153.    Defendants knew, or should have known, that citizens experiencing homeless are more likely than other members of the public to be the victims of violent crime and or property crime.

154.    By forcing Plaintiffs and the putative class to abandon encampments located in well-lit and high-traffic areas, Defendants have created a threat of violence and victimization by other members of the public.

155.    Absent the injunctive relief sought, the Plaintiffs and putative class members will be harmed by dangers created by the Defendants' acts and omissions.

**Count Nine**
***Monell* Liability: City of Cincinnati**
**(42 U.S.C. § 1983)**

Plaintiffs incorporate all previous paragraphs and allegations as if fully rewritten here and further state as follows.

156.    The City is a state actor incorporated under the laws of the State of Ohio.

157.    The City, the City Mayor, the City Solicitor, and City officials act under color of law when citing, arresting, or imprisoning homeless citizens pursuant to court order, Policy 12.111, and or Ohio law.

158.    The Defendants knew, or should have known, that the above-listed acts and omissions violated citizens' constitutional right to travel, free speech, privacy, due process, and equal protection, as well as citizens' right to protection against cruel and unusual punishment.

159.    Defendants' acts and omissions caused Plaintiffs, and putative class members, to suffer deprivation of their constitutional right to travel, free speech, privacy, due process, and equal protection, and has caused them to suffer cruel and unusual punishment.

**Count Ten**
**Vagueness**
**(R.C. 2911.21(A)(1)(B))**

Plaintiffs incorporate all previous paragraphs and allegations as if fully rewritten here and further state as follows:

160.     Under Ohio Revised Code (R.C.) § 2911.21, any person who knowingly enters or remains on the land or premises of another, without the privilege to do so, can be charged with criminal trespass.  It is no defense that the land or premises is owned, controlled, or in the custody of a public entity.

161.     The statute does not define "privilege," nor does the statute indicate how one is granted the privilege with respect to land or premises owned, controlled, or in the custody of a public agency as provided by R.C. § 2911.21(B).

162.     Without adequate notice as to whether one enjoys a privilege to remain on public property, in this case public sidewalks and rights of way, R.C. § 2911.21 is unconstitutionally vague in that it does not provide adequate notice that one might be subjected to a deprivation of their liberty and property interest for sheltering in a public place, in violation of the Fifth Amendment's Due Process Clause.

**Count Eleven**
**Sham Legal Process**
**(R.C. 2921.52)**

163.     Under R.C. 2921.52, "Sham legal process" means an instrument that (1) is not lawfully issued; (2) purports to be an order of a court, to assert jurisdiction over the legal or equitable rights of any person or property, or to require or authorize the search, seizure, indictment, arrest, trial, or sentencing of any person or property; and that (3) is designed to make another person believe that it is lawfully issued.

164.     On August 3, 2016, the Defendant City Solicitor represented to this Court that residents of the Third Street Camp would not be prevented from returning to their campsite after the City completed cleaning the area.

165.     Notwithstanding the Solicitor's representations to this Court, also on August 3 Defendant City Mayor asked Defendant Hamilton County Prosecutor to sue the City for failing to abate an alleged nuisance caused by the Third Street Camp.  Knowing the parties shared a desire to remove the encampment, Defendant Hamilton County Prosecutor nonetheless sought a temporary restraining order and permanent injunction against the City to effect that removal without joining the Plaintiffs in this action.

166.     The Orders issued by Defendant Judge Ruehlman constitute "sham legal process" in that (1) there was no *bona fide* case or controversy between the City and the County, (2) the orders asserted jurisdiction over Plaintiffs' constitutional rights and authorized their arrest, and in that (3) the orders were intended to make camp residents, law enforcement, and others believe it was lawfully issued.

167.     The Defendants' use of sham legal process caused Plaintiffs to suffer deprivation of their constitutional right to travel, free speech, privacy, due process, and equal protection, and has caused them to suffer cruel and unusual punishment.

## **PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and all members of the putative class, submit the following prayer for relief:

1.  An order certifying this suit as a class action;

30

2. A declaration that City Policy 12.111 violates, and will continue to violate, the rights of its citizens under the Privileges and Immunities Clause, as well as under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution;

3. A temporary restraining order and permanent injunction prohibiting the City from enforcing Policy 12.111 against anyone regardless of their living situation.

4. A temporary restraining order enjoining the Hamilton County Court of Common Pleas from proceeding in Case A1804285 pursuant to 28 U.S.C. § 2283.

5. An order vacating the permanent injunction issued by the Court of Common Pleas in Case A1804285;

6. Monetary damages for Plaintiffs' property that has been lost, damaged, or destroyed due to the conduct at issue in this case;

7. An award of reasonable attorneys' fees and costs; and

8. Any such other legal and equitable relief this Court deems just and proper.

Respectfully Submitted,

s/ Bennett P. Allen
Bennett P. Allen (96031)
COOK & LOGOTHETIS, LLC
30 Garfield Place, Suite 540
Cincinnati, OH 45202
P: (513) 287-6992
F: (513) 721-1178
ballen@econjustice.com
*Trial Attorney for Plaintiffs*

David M. Cook (23469)
COOK & LOGOTHETIS, LLC
30 Garfield Place, Suite 540
Cincinnati, OH 45202
P: (513) 287-6980
F: (513) 721-1178

dcook@econjustice.com
*Co-Counsel for Plaintiffs*

Jennifer Kinsley (71629)
Kinsley Law Office
P.O. Box 19478
Cincinnati, OH 45219
kinsleylawoffice@nku.edu
*Co-Counsel for Plaintiffs*