## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| JOSEPH PHILLIPS, *et al.*, | : | Case No. 1:18-cv-541 |
| | : | |
| Plaintiffs, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| CITY OF CINCINNATI, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT (Doc. 51)

This civil case is before the Court on Defendants City of Cincinnati (hereinafter the "City" or "Defendant") and Mayor John Cranley's motion to dismiss Plaintiffs' third amended complaint (Doc. 51) and the parties' responsive memoranda (Docs. 53, 55). Plaintiffs claim that Defendants' policy and custom of making homeless encampments illegal throughout the City of Cincinnati violates their constitutional rights. Defendants deny all liability.

## I.     OVERVIEW

The measure of a just society is how it treats its most vulnerable members. One can have a good debate on how to do that properly, but let us agree that it must be our goal.

Here, the City has determined to deal with the homeless (the unhoused) by outlawing homeless encampments. This federal lawsuit inevitably followed. The City has now moved to dismiss the lawsuit three times.

At this stage of the lawsuit, the Court must determine which, if any, of Plaintiffs' eleven claims should be dismissed, and which, if any, should remain pending.  That is, which claims, if any, contain sufficient factual allegations, accepted as true, adequate to state a claim to relief that is plausible on its face.  Plausibility is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.  At this stage of the lawsuit, the Court must view the complaint in the light most favorable to Plaintiffs, and take all well-pleaded factual allegations as true.

Recognizing that Plaintiffs have not proven anything yet, <u>the Court decides in this Order that Plaintiffs may now proceed on seven claims.</u>

The legal reasoning behind this determination is substantial and complex, requiring over 80 pages of written work.  Accordingly, in this Section I, the Court first offers this short summary in attempted plain English.

Plaintiffs have adequately pled (presented) an Eighth Amendment claim of cruel and unusual punishment. (Count IV).  The Eighth Amendment prohibits cruel and unusual punishments.  Jailing people for living in homeless encampments, if and when there is no shelter available, could constitute cruel and unusual punishment.  Plaintiffs have provided enough facts to go forward on their claim that housing is not available for some specific unhoused people, nor for all, and, therefore, jailing people for being unhoused is cruel and unusual punishment.

Plaintiffs have adequately presented that the Permanent Injunction making homeless encampments illegal violates Plaintiffs' First Amendment right to free speech.

(Count I (as narrowed)). The First Amendment protects citizens' right to free speech. Living outside in a homeless encampment could be considered an expression of free speech. Here, Plaintiffs have provided enough facts to go forward on their claim that the Cincinnati homeless encampments were an expression of free speech to call attention to the crisis of the shortage of affordable housing shortage in Cincinnati, and that the Permanent Injunction unlawfully restricts that expression.

Plaintiffs have adequately presented a claim for violation of the constitutional right to travel. (Count VI). The Fourteenth Amendment promises citizens the virtually unfettered ability to lawfully and freely travel. Citing and arresting unhoused persons for sleeping in public spaces could violate the right to travel by denying unhoused people the necessity of a safe place to sleep, rest, and recuperate. Plaintiffs have provided enough facts to go forward on their claim that the bar on homeless encampments, if and when housing is not available for certain specific unhoused individuals, nor for all, unlawfully burdens the right to travel.

Plaintiffs have adequately presented a Fourteenth Amendment substantive due process claim. (Count VIII). The Fourteenth Amendment protects citizens from state actions that increase their risk of harm (*i.e.*, a state-created danger). If the City is requiring the homeless to vacate well-lit and high-traffic public land, or go to jail, when housing is not available for some specific unhoused people, nor for all, and taking and destroying their tents, tarps, blankets, clothing, and other property, then the City may be creating an unlawful state-created danger for the homeless. Plaintiffs have provided

enough facts to go forward on their claim that the City's bar on homeless encampments is an unlawful state-created danger in violation of the Fourteenth Amendment.

Plaintiffs have adequately presented a Fourteenth Amendment procedural due process claim. (Count III). The Fourteenth Amendment protects citizens from having their life, liberty, or property taken away without due process (*i.e.*, it requires fairness in process). Confiscating or destroying property without fair notice could be a due process violation. Here, Plaintiffs have provided enough facts to go forward on their claim that the City has failed to provide adequate notice regarding the collection or destruction of their property.

Plaintiffs have adequately presented a claim that Ohio's criminal trespass statute, Ohio Revised Code § 2911.21(A)(1)(B), is unconstitutionally vague as applied to persons, including Plaintiffs, who seek shelter on public property. (Count X). A statute may be unconstitutionally vague if it does not provide adequate notice to citizens that they might be subjected to a loss of personal liberty or property for engaging in a certain activity. Plaintiffs have provided sufficient facts to go forward on their claim that Ohio's criminal trespass statute may be unconstitutionally vague, as applied to them by the City, for not providing adequate notice that individuals may be deprived of liberty or property interests for sheltering in a public space.

Plaintiffs have adequately presented a *Monell* liability claim. (Count IX). *Monell* liability allows citizens to hold a municipality responsible for policies and customs that lead to a constitutional violation. If the City has a policy or custom of evicting and arresting unhoused persons residing in homeless encampments, that leads to or causes

constitutional violations, the City could be liable. Plaintiffs have provided sufficient facts to go forward on their claim that the City has a policy or custom of evicting and arresting unhoused persons who cannot secure shelter, and that the City's policy or custom has violated Plaintiffs' constitutional rights.

Plaintiffs have not proven anything yet … nor are they required to at this stage of the lawsuit.

However, based on Plaintiffs' allegations in their Third Amended Complaint, Plaintiffs are entitled to proceed to discovery (collection of evidence) and subsequent summary judgment proceedings (motions for judgment without trial) on these seven claims.

After summary judgment proceedings, if any of Plaintiffs' seven claims survive, those claims shall proceed to trial by jury.[1]

---

[1] In this Order, the Court also dismisses five of Plaintiffs' claims:

Count I: That portion of Count I which alleges that Policy 12.111 violates Plaintiffs' First Amendment right to free speech fails and is dismissed.

Count II: Plaintiffs' Fourth Amendment unreasonable seizure claim fails and is dismissed.

Count V: Plaintiffs' claim brought under the Equal Protection Clause is dismissed as forfeited.

Count VII: Plaintiffs' claim brought under the Americans with Disabilities Act is dismissed as forfeited.

Count XI: Plaintiffs fail to state a claim for sham legal process against the Mayor of Cincinnati and is dismissed. Accordingly, Mayor Cranley is dismissed as a Defendant. The single remaining Defendant is the City of Cincinnati.

## II.    FACTUAL BACKGROUND

For purposes of Defendants' motions to dismiss, the Court must: (1) view the complaint in the light most favorable to Plaintiffs, and (2) take all well-pleaded factual allegations as true. *Bickerstaff v. Lucarelli*, 830 F.3d 388, 396 (6th Cir. 2016).

On May 29, 2019, this Court granted in part and denied in part Plaintiffs' motion for leave to file a third amended complaint. (Doc. 46). Plaintiffs' third amended complaint joins Patrick T. Chin and the Greater Cincinnati Homeless Coalition as Plaintiffs and joins Cincinnati Mayor John J. Cranley as a defendant. (Doc. 47). Plaintiffs Joseph Phillips and Patrick Chin are Cincinnati residents who have been without shelter for ten and three years, respectively. (*Id.* at ¶¶ 51, 52). Both Plaintiffs have been threatened with arrest for living outdoors. (*Id.* ¶¶ 51, 52, 62). Phillips and Chin bring this action on behalf of themselves and similarly situated residents of Cincinnati and Hamilton County who experience homelessness, lack fixed nighttime shelter, and who have been threatened with arrest or have been arrested pursuant to the City's enforcement of its homeless encampment policy. (*Id.* at ¶ 89). The third named Plaintiff, the Greater Cincinnati Homeless Coalition, is a non-profit organization whose mission is to end homelessness, focusing on Hamilton County and the City of Cincinnati. (*Id.* at ¶ 53).

Plaintiffs' action against Mayor Cranley and the City of Cincinnati seeks declaratory and injunctive relief. Plaintiffs seek a declaration that the City's policy governing "police interaction with homeless encampments" ("Policy 12.111") violates the First, Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

(*Id.* at 31). In addition, Plaintiffs seek to enjoin the City from "arresting citizens experiencing homelessness" and "seizing or destroying their property" pursuant to Policy 12.111 and/or a Permanent Injunction issued by the Hamilton County Court of Common Pleas prohibiting homeless encampments. (*Id.* at ¶¶ 1-2). Plaintiffs also seek compensatory damages for their lost, damaged, or destroyed property. (*Id.* at 31).

Without access to shelter, Plaintiffs Phillips and Chin have lived at various outdoor locations. (*Id.* at ¶¶ 51, 52). Joseph Phillips has resided at upwards of 100 outside locations but has had to abandon those locations because the police forced him to move or be arrested. (*Id.* at ¶ 51). For a time, Patrick Chin resided at an encampment with other homeless residents located along Fort Washington Way in Cincinnati, before the City threatened him with arrest and destroyed his property on July 27, 2018. (*Id.* at ¶¶ 52, 62). Both Chin and Phillips have also resided at a homeless encampment on Third Street in Cincinnati. (*Id.* at ¶¶ 51, 52).

On July 27, 2018, "the City threatened with arrest the citizens living in the Fort Washington Camp and then destroyed their property, without regard for whether it was *bona fide* trash . . . ." (*Id.* ¶ 62). Plaintiff Chin was residing at the Fort Washington Camp at the time, and the City seized or destroyed all of his personal belongings during the forced evacuation. (*Id.* at ¶ 52).

On July 31, 2018, the City distributed notices at the Third Street Camp advising that the area would be "closed for cleaning and maintenance" on August 3, 2018 at 2 p.m. (*Id.* at ¶ 64). The notice ordered residents to vacate and informed that any personal property left behind would be considered abandoned. (*Id.*). On August 3, 2018, Joseph

Phillips filed the instant action in federal court seeking a temporary restraining order to prevent the City from evacuating the Third Street encampment and discarding its residents' possessions. (*See* Doc. 2).

The original complaint challenged the constitutionality of the City's enforcement of Policy 12.111, a policy governing "police interaction with homeless encampments." (Doc. 1, Doc. 47-1 at 2-4). Policy 12.111 permits the police to arrest individuals living in a "homeless encampment" for trespassing after providing 72 hours' notice. (Doc. 47-1 at 2). The Policy defines a homeless encampment as a "tent city" or "group of individuals living together in a public area." (*Id.*). It further states that a homeless encampment may consist of a single person and that an encampment will generally include some type of shelter, such as a tent or "lean-to" made of cardboard. (*Id.*) (emphasis added).

Citing health and safety concerns, Mayor Cranley defended the evacuation, releasing the following statement: "[a]llowing activists to organize homeless camps in public rights-of-way poses a direct threat to public health and safety for those staying in encampments, and people who visit and work near these areas . . . . This is a public health emergency and we are required to respond in a way that ensures safety." (Doc. 47 at ¶ 63).

On August 3, 2018, following a public hearing, this Court denied Phillips' motion for a temporary restraining order enjoining the evacuation of the Third Street Camp. (Doc. 4). Focusing on Plaintiff's claim that the encampment constituted political speech protected by the First Amendment, the Court found that Plaintiff failed to demonstrate a high likelihood of success on the merits. (*Id.*). Important to the Court's ruling was the

8

temporary nature of the evacuation, with residents able to return within a couple of hours. (*Id.* at 4–§5). Consequently, the Third Street camp residents left, the City cleaned the area, and the residents returned. Plaintiffs allege that during the course of this first evacuation, the City did not gather any evidence of human waste in or near the camp or discover evidence of illegal drug use by the camp's residents. (Doc. 47 at ¶ 66).

The Cincinnati Mayor, John Cranley, and Hamilton County Prosecutor, Joe Deters, then filed an allegedly coordinated lawsuit in state court that culminated in a permanent injunction banning homeless encampments within the limits of Hamilton County. Prior to the Prosecutor's initiation of the state lawsuit, Mayor Cranley released the following statement:

> It is unacceptable that individuals and activists continue to illegally camp with tents in the right-of-way. This presents a clear and present health and safety hazard to homeless individuals and the general public. The city is working hard to end this. This afternoon, I also asked for and have obtained the assistance of Hamilton County Prosecutor Joe Deters. Prosecutor Deters will be filing actions in state court and we will file motions in federal court. I thank Prosecutor Deters for his help in this matter. Together we will continue to pursue all strategies to end this unsafe practice. I ask for patience as we pursued [sic] appropriate court orders.

(*Id.* at ¶ 67; Doc. 47-1 at 130). Three days later, on August 6, 2018, Prosecutor Deters filed a complaint on behalf of the State of Ohio against the City of Cincinnati in the Hamilton County Court of Common Pleas seeking a declaration that the "the activity currently being permitted in the area of the City of Cincinnati south of Central Parkway to the Ohio River is a nuisance" and requesting a permanent injunction "remov[ing] from the area" all persons and property constituting the nuisance, to be enforced by the City.

(Doc. 47 at ¶ 68; 47-1 at 133–34).  Along with the complaint, Prosecutor Deters filed a motion for an *ex parte* temporary restraining order to close the encampment.  (Doc. 47-1 at 138–144).

Affidavits were submitted in support of the complaint from the city police captain, Michael Neville, the assistant to the city manager, Kelly Carr, and the interim health commissioner, Marilyn Crumpton.  (Doc. 47 at ¶¶ 69–71).  The affidavits refer to various complaints made about the Third Street camp, photographs depicting alcohol abuse at the site, and reports from the police department and health department concerning unsanitary conditions and drug use; however, no actual documentation was attached to the affidavits. (*Id.*).  In addition, as Plaintiffs point out, the health commissioner's affidavit merely refers to risks and concerns associated with those experiencing homelessness generally, without identifying health issues posed by the Third Street camp in particular.  (*Id.* at ¶ 71).

The Hamilton County Court of Common Pleas granted the prosecutor's motion for a temporary restraining order that same day, ordering that the encampment located "south of Central Parkway to the Ohio River . . . be cleared through any lawful means necessary[,] including arrest," and that all items remaining on the premises be stored or discarded. [2]  (*Id.* at ¶ 73; Doc. 47-1 at 172-176).

The residents of the Third Street camp complied with the order and, beginning at approximately 9:00 p.m. on August 6th, relocated north of Central Parkway.  (Doc. 47 at

---

[2] The case was assigned to Judge Robert Ruehlman, who was that month's equity judge, as Defendants were aware.

¶ 74). The following day, in response to the camp's relocation, Prosecutor Deters filed a motion to amend the restraining order, which the Court of Common Pleas granted, thereby expanding the prohibited area "to include the additional area between I-71 and I-75 on the East and West and St. Route 562 to the North." (*Id.* at 75; Doc. 47-1 at 179–83).

Facing another forced move, Plaintiff Phillips filed a second motion for temporary restraining order in this Court on August 7, 2018. (Doc. 7). Following a hearing on August 8, 2018, the Court denied Plaintiff's motion. (Doc. 19). This time, Plaintiff's motion focused on an Eighth Amendment claim of cruel and unusual punishment, and the Court found that Plaintiff failed to demonstrate a high likelihood of success on the merits having not adequately demonstrated that space was not available for him at a Cincinnati shelter. (Doc. 19 at 5–6).

Consequently, the camp residents relocated for a second time, this time to Gilbert Avenue—outside the restricted area. (Doc. 47 at ¶ 78). The County prosecutor again moved to amend the temporary restraining order, this time seeking to enjoin encampments in "the entire geographic area of Hamilton County, Ohio" to be enforced "only so long as there is shelter space available." (Doc. 47 at ¶ 79; Doc. 47-1 at 186). The second amended temporary restraining order was entered on August 9, 2018, and that night shortly before 10:00 p.m., Cincinnati Police forced the residents to evacuate Gilbert avenue under threat of arrest. (Doc. 47 at ¶ 79).

The residents relocated for a third time, settling on private property located at Thirteenth Street and Republic Avenue. (*Id.*). Soon thereafter, Mayor Cranley released a

statement threatening to arrest those encamped on Thirteenth and Republic. (*Id.* at ¶ 81). On August 16th, the County Prosecutor and City submitted a proposed "Judgment Entry, Order, and Permanent Injunction" (the "Permanent Injunction"). (Doc. 47-1 at 196–98). The proposed order had been "negotiated" by the Prosecutor and City, stating that "Relator and Respondent have been working together in an effort to come to an agreement to avoid further litigation." (*Id.*).

The Permanent Injunction, entered the same day, found—based on agreed, stipulated facts—that "illegal encampments" are "a moving nuisance." (Doc. 47-1 at 7). The injunction ordered the Hamilton County Sheriff and Cincinnati Police Department to clear the encampments "through any lawful means necessary, including arrest" on public property located within Hamilton County, as well as on privately owned "unlicensed parks" within county limits. (*Id.* at 9–10). The injunction also ordered the County Sheriff and City Police to "maintain these areas against their use as illegal encampments." (*Id.* at 9).

Further, the injunction ordered the County Sheriff or City of Cincinnati to seize any tent or shelter found within Hamilton County, storing them for a period of sixty days and disposing of them if not claimed within that period. (*Id.*). All other remaining items were to be inventoried and stored, with items "reasonably considered soiled or garbage" discarded. (*Id.*).

Finally, the injunction ordered the County Sheriff or City Police to provide a copy of the order to any person found erecting a tent or shelter on public grounds, stating "[s]hould that person refuse to comply after being given a copy of this order, they shall

be subject to arrest for contempt . . . ." (*Id.* at 10).  Like the second amended temporary restraining order, the Permanent Injunction orders enforcement "at all times that space is available in shelters for the homeless." (*Id.*).  Thus, the Permanent Injunction effectively banned sleeping outside with any protection from the elements in Hamilton County.

Upon entry of the Permanent Injunction, the residents of the encampment at Thirteenth Street and Republic Avenue agreed with the landowner to vacate the premises. (Doc. 47 at ¶ 83).  Since then, Plaintiff Phillips and Chin have refrained from setting up tents and other structures open and obvious to the public for fear of arrest and loss of property.  (*Id.* at ¶ 85).

Following entry of the Permanent Injunction, New Prospect Baptist Church, a local religious organization that was not party to the original state action or injunction, filed a separate lawsuit in the First District Court of Appeals seeking a writ of mandamus and writ of prohibition challenging Judge Ruehlman's authority to issue the county-wide Permanent Injunction.[3]  *See State of Ohio ex rel. New Prospect Baptist Church v. Hon. Robert P. Ruehlman*, No. C-180591, 2019 WL 6977927 (Ohio Ct. App. Dec. 20, 2019). New Prospect Baptist Church had offered its four-acre plot in the Roselawn neighborhood of Cincinnati as a refuge for people experiencing homelessness and feared

---

[3] The Court takes judicial notice of the outcome of this state proceeding without converting the motion to dismiss into one for summary judgment.  Fed. R. Evid. 201; *see Chase Bank U.S.A., N.A. v. City of Cleveland*, 695 F.3d 548, 553 n.2 (6th Cir. 2012) ("We can take judicial notice of developments in related 'proceedings in other courts of record.'") (quoting *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 972 n.5 (6th Cir. 2005)); *see also Buck v. Thomas M. Cooley Law Sch.*, 597 F.3d 812, 186 (6th Cir. 2010) ("Although typically courts are limited to the pleadings when faced with a motion under Rule 12(b)(6), a court may take judicial notice of other court proceedings without converting the motion into one for summary judgment.").

being subject to the Permanent Injunction. *Id.* at *1. On December 20, 2019, the state court of appeals issued an order granting in part New Prospect's petition for a writ of prohibition and limiting the scope of the injunction in several ways.[4] *Id.*

Relevant to the instant case, the state court of appeals found that the Permanent Injunction was overbroad insofar as it attempted to prohibit non-parties like New Prospect (who were not aiding or abetting the City) from providing space for the homeless. *Id.* at *3. The court also found that the trial court acted outside its jurisdiction by expanding the scope of the injunction beyond the limits of the City of Cincinnati to include all of Hamilton County, as the City was the only named defendant. *Id.* Further, the appellate court found the Permanent Injunction to be unauthorized to the extent that it imposed additional health and safety requirements on private campsites beyond those provided for by Ohio law, particularly for a campsite operator who "neither intends to receive nor receive anything of value" from the camp. *Id.* at *4. With these clarifications, the court of appeals concluded that Judge Ruehlman was otherwise authorized by law to ban homeless encampments on public property within the City of Cincinnati. *Id.* at *5.

Plaintiffs' third amended complaint seeks to enjoin the City from "arresting citizens experiencing homelessness" and "seizing or destroying their property" and from enforcing Policy 12.111 and/or the Permanent Injunction banning homeless

---

[4] As the opinion explains, a writ of prohibition permits a non-party to challenge a lower court's action on the basis that the court was acting beyond its jurisdiction. *State of Ohio ex rel. New Prospect Baptist Church*, 2019 WL 6977927, at *1.

encampments. (Doc. 47 at ¶¶ 1–2). The complaint alleges that Cincinnati's enforcement of Policy 12.111 and/or the Permanent Injunction violates their constitutional rights under the First, Fourth, Eighth, and Fourteenth Amendments.[5] Plaintiffs also bring a state-law "sham legal process" claim against Mayor Cranley. Defendants move to dismiss each of Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, 12(b)(6) for failure to state a claim, or 12(7) for failure to join a necessary party.

## III.    STANDARD OF REVIEW

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." To show grounds for relief, Federal Rule of Civil Procedure 8(a) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

While Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Pleadings offering mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). In

---

[5] The City moved to dismiss Plaintiffs' claims brought under the Equal Protection Clause (Count V) and the Americans with Disabilities Act (Count VII). Plaintiffs failed to address these claims in their response brief. Accordingly, Counts V and VII are dismissed as forfeited. *Thornton v. City of Columbus*, 171 F. Supp. 3d 702, 705 (S.D. Ohio 2016) (citing *Humphrey v. United States AG Office*, 279 F. App'x 328, 331 (6th Cir. 2008)).

determining a motion to dismiss, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  Further, the "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Id.*

Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is plausible where a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but it has not 'show[n]'—'that the pleader is entitled to relief,'" and the claim shall be dismissed.  *Id.* at 679 (quoting) Fed. R. Civ. P. 8(a)(2)).

## IV.    ANALYSIS

### A.    The Permanent Injunction does not moot Plaintiffs' claims

The City makes a threshold argument that Plaintiffs' claims are moot because Cincinnati's Policy 12.111 governing police interaction with homeless encampments has been "superseded" by the Permanent Injunction and is no longer in effect.  (Doc. 51 at 12-13).  In response, Plaintiffs assert that their claims have not been mooted by the Permanent Injunction, which furthers the mission of Policy 12.111 and "increases the threat of a violation of Plaintiffs' rights . . . ."  (Doc. 53 at 3–4).

16

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). Plaintiffs' third amended complaint challenges the City's enforcement of Policy 12.111 and the Permanent Injunction, both of which embody the City's policy of arresting people experiencing homelessness for sleeping in tents and makeshift shelters outside.

It is at best unclear at this point how Policy 12.111 and the Permanent Injunction interact. At times, the City argues that Policy 12.111 is no longer in effect following the state court's entry of the Permanent Injunction. (*See* Doc. 51 at 36). Yet, at other times, it states that "Policy 12.111 provides guidance with respect to [the injunction's] enforcement." (Doc. 51 at 25). Construing the complaint in the light most favorable to Plaintiffs, the Court is not persuaded at this time that Cincinnati has ceased enforcing Policy 12.111.

It is true that a case may become moot when a change in policy amounts to a "voluntary cessation" of the challenged conduct such that there is "no reasonable expectation that the alleged violation will recur." *Speech First, Inc*, 939 F.3d at 767 (citing *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979)). Yet, voluntary cessation "does not, as a general rule, moot a case," and a defendant that is a public entity must, at a minimum, indicate that there has been a genuine change in policy. *Id.* at 767–68. Here, the City makes a technical argument that Policy 12.111 is no longer in effect, and that Plaintiffs must challenge the Permanent Injunction. The City does not so much as allege that the Permanent Injunction has *in substance* altered Cincinnati's policy regarding

17

homeless encampments such that there is "no reasonable expectation that the alleged violation[s] will recur."  *Speech First, Inc.*, 939 F.3d at 767.  Consequently, the City's argument that Plaintiffs' claims were mooted by the Permanent Injunction is not persuasive.[6]

### B.     Abstention

Bound up with the City's mootness argument, is a separate argument that "[e]ven were this case not moot under Article III, principles of federalism and comity counsel against exercising federal jurisdiction until Plaintiffs exhaust their remedies in state court."  (*Id.* at 14).  Along those lines, the City asserts that the Court should dismiss the case without prejudice or hold the federal action in abeyance to allow Plaintiffs to challenge the injunction in state court.  (*Id.* at 13).  Elaborating on this point in their reply brief, the City states that Plaintiffs' failure to intervene in the underlying state court litigation "does not entitle them to skirt their obligations to seek state court relief for issues ordered by the state court or authorize this federal District Court to serve as the appellate court for the permanent injunction."  (Doc. 55 at 2).

The City appears to be invoking the jurisdictional *Rooker-Feldman* doctrine, which "stands for the simple [ ] proposition that lower federal courts do not have jurisdiction to review a case litigated and decided in state court; only the United States Supreme Court has jurisdiction to correct state court judgments."  *Gottfried v. Med.*

---

[6] The City's argument that "Plaintiffs should be required to join the Hamilton County Sherriff" lacks merit in light of the state court of appeals' decision limiting the scope of the Permanent Injunction to the City of Cincinnati.

*Planning Servs.*, 142 F.3d 326, 330 (6th Cir. 1998). Yet, the *Rooker-Feldman* doctrine does not apply to suits in federal court brought by a party that was not involved in the state court action. *United States v. Cty. of Muskegon*, 298 F.3d 569, 579 (6th Cir. 2002); *see also Van Hoven v. Buckles & Buckles, P.L.C.*, 947 F.3d 889, 892 (6th Cir. 2020) (noting that *Rooker-Feldman* applies to the "narrow" set of "cases brought by state-court losers complaining of injuries caused by state-court judgment . . .") (quoting *Exxon Mobil Corp. v. Saudi Basic Indus.*, 544 U.S. 280, 284–91 (2005)). Plaintiffs were not a party to the underlying state-court action between the County Prosecutor and City of Cincinnati; therefore, the *Rooker-Feldman* doctrine does not bar Plaintiffs from challenging Policy 12.111 or the Permanent Injunction.

It is possible that the City intended to argue that the Court should abstain from hearing the case based on another of the many well-established abstention doctrines—*i.e., Younger* abstention or *Colorado River* abstention. But that is unlikely, both because the City does not cite to any particular abstention doctrine by name, and because upon the Court's own review, none of the doctrines apply under the present circumstances. Plaintiff was not a party to the state case resulting in the Permanent Injunction and there are no ongoing state court proceedings. *See Gottfried*, 142 F.3d at 329 (finding abstention under *Younger v. Harris*, 401 U.S. 37 (1971) and the Anti-Injunction Act inapplicable where the plaintiff was a "stranger to the state proceedings"); *id.* (noting abstention doctrine established by *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976) applicable only when there is an ongoing state proceeding parallel to the federal case).

The City's statements suggesting the Court should dismiss or stay the case out of concerns of federalism and comity more closely align with the principle recognized in *Gottfried*, that under certain circumstances, a federal district court should refrain from exercising its jurisdiction based on considerations of "equity, comity, and our federalist judicial system" even though the case does not "precisely fit any of the jurisdictional doctrines normally applicable." *Id.* at 330.

Yet, the City has not adequately raised an abstention argument pursuant to *Gottfried*. It does not refer to *Gottfried*, and the only case the City cites to support its statement concerning comity and federalism, at the close of its mootness argument, is an out-of-circuit case applying the mootness doctrine, not abstention. (Doc. 51 at 14) (citing *In re Grand Jury Proceedings John Doe # 462*, 757 F.2d 600 (4th Cir. 1985)). In fact, the City does not invoke the term "abstention" at all in its briefs. It is therefore unsurprising that Plaintiffs do not address the possibility of abstention in their response brief.

The Sixth Circuit has characterized abstention pursuant to *Gottfried* as non-jurisdictional. *See Cty. of Muskegon*, 298 F.3d at 579. And generally, courts are not obligated to address non-jurisdictional arguments that are not raised by the parties. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008). Moreover, federal courts treat abstention "as a limited carve-out to federal courts' 'virtually unflagging obligation' to exercise their jurisdiction." *See Hill v. Snyder*, 878 F.3d 193, 205 (6th Cir. 2017) (discussing *Younger* abstention) (quoting *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988)). This hesitancy to decline jurisdiction based on judge-made exceptions is

20

grounded in the "undisputed constitutional principle that Congress, and not the Judiciary, defines the scope of federal jurisdiction within the constitutionally permissible bounds." *Mason v. Lockwood, Andrews & Newnam, P.C.*, 842 F.3d 383, 394 (6th Cir. 2016) (quoting in a parenthetical *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 359 (1989)).

Nevertheless, the Sixth Circuit has taken a forgiving approach to the forfeiture of abstention arguments. For example, the Sixth Circuit has found that a defendant's failure to raise *Younger* abstention prior to defending the case on the merits does not preclude that defendant from raising *Younger* at a later stage in the litigation. *O'Neil v. Coughlan*, 511 F.3d 638, 643 (6th Cir. 2008) (going so far as to suggest that waiver of *Younger* abstention must be explicit); *see also The Fifth Column, LLC v. Village of Valley View*, 221 F.3d 1334, 2000 WL 799785, at *4 (6th Cir. June 13, 2000) (unpublished table decision) ("Mere failure to raise the abstention issue is not sufficient to waive it."); *Bellotti v. Baird*, 428 U.S. 132, 143 n.10 (1976) (noting that *Pullman* abstention may be raised *sua sponte*). It is possible the Sixth Circuit's relaxed approach to the forfeiture of abstention arguments is unique to *Younger* abstention which has been described as "the broadest" form of abstention, requiring a court to decline jurisdiction absent extraordinary circumstances. *Beeman v. Stafford*, 62 F.3d 1419, 1995 WL 456367, at *3 (6th Cir. 1995) (unpublished table decision). Additionally, unlike the defendant in *O'Neil* who raised *Younger* abstention, albeit well into the litigation, here, Defendants have not yet raised the argument. Nevertheless, out of an abundance of caution, the Court will *sua sponte* address the issue of abstention under *Gottfried* in the alternative.

The plaintiff in *Gottfried*, an anti-abortion protester, wanted to picket outside the home, office, and abortion clinic of a physician. The physician, however, had obtained a state-court injunction a decade earlier restricting picketing at those locations that remained in effect. 142 F.3d at 328. Fearing arrest should the injunction be enforced against her, the plaintiff filed suit requesting that a federal district court declare the injunction unconstitutional and enjoin the city from enforcing the injunction against her. *Id.* The Sixth Circuit found that none of the recognized abstention doctrines applied, as the plaintiff had not been a party to the injunction and there was no ongoing state action. *Id.* at 329–30. Yet, the court held that "equity, comity, and our federalist judicial system require the federal court to give the state judge the first chance to bring the injunction into compliance with constitutional law." *Id.* at 330.

In doing so, the Court relied on the rationale behind the *Pullman* abstention doctrine, which "requires a federal court, faced with a constitutional challenge to an uncertain state law, to defer the constitutional question and avoid a direct confrontation if a decision from the state court 'might avoid in whole or in part the necessity for federal constitutional adjudication.'" *Id.* at 331 (quoting *Harrison v. NAACP*, 360 U.S. 167, 177 (1959)). Based on this principle of constitutional avoidance, the court held that "a federal court should abstain when a nonparty to a state court injunction brings a First Amendment challenge to the injunction in federal court before requesting relief from the state court." *Id.* at 332. The court further reasoned that such an approach would be the most efficient, as it would allow the state court to take into consideration changes in the law that had occurred over the past decade and to reassess the injunction's continued

necessity and scope; recognizing that only the state court, and not the federal court, would be capable of *modifying* the injunction.  *Id.*

Under the unique circumstances presented in the instant case, abstention pursuant to *Gottfried* is not warranted.  In *Gottfried*, over a decade had passed since entry of the permanent injunction at issue, giving the court reason to believe that, if given the opportunity, the state court that entered the injunction may find the injunction no longer necessary or subject to meaningful amendment based on intervening changes in the law. By contrast, the Plaintiffs here initiated this federal lawsuit challenging the constitutionality of Cincinnati's policy of arresting homeless people living in makeshift shelters *prior to entry of the Permanent Injunction* that is now challenged in the third amended complaint.  This lessens the *Gottfried* court's comity concern, as the Hamilton County Court of Common Pleas was doubtlessly aware of Plaintiffs' constitutional concerns and crafted the Permanent Injunction accordingly.  In this sense, the state court has already had a first stab at molding an injunction compliant with the Constitution based on the present state of the law.  (Doc. 51 at 20 ("The fact that the permanent injunction is in effect only when adequate shelter is available reflects a nuanced approach to this complex societal concern.")).

In addition, the *Gottfried* court's reasoning that sending the plaintiffs to state court first would be more efficient, because the state court, unlike the federal court, would be capable of amending the injunction, does not apply in this case.  While Plaintiffs similarly bring a First Amendment claim in this Court, they also raise among other claims, an Eighth Amendment claim of cruel and unusual punishment alleging that "[i]n a

municipality without enough affordable housing or enough shelters, it is cruel and unusual to search, seize, arrest, or imprison someone solely because they are homeless." (Doc. 47 at ¶ 128).  Having alleged that there is inadequate shelter space in Cincinnati, Plaintiffs are essentially arguing that under existing circumstances, the injunction cannot be implemented in a constitutional manner.  *See Martin v. Boise*, 920 F.3d 584, 617 (9th Cir. 2019) (holding that "[S]o long as there is a greater number of homeless individuals in a jurisdiction than the number of available beds in shelters, the jurisdiction cannot prosecute homeless individuals for involuntarily sitting, lying, and sleeping in public.") (quotations, brackets, and citations omitted).  Consequently, this is not a situation where the plaintiff's constitutional concerns can be alleviated by a mere tweaking of the terms of the injunction.  Moreover, based on the nature of Plaintiffs' claims, the Court is not concerned than permitting Plaintiffs to proceed in federal court would "thrust the federal court into an unseemly, repetitive, quasi-systematic, supervisory role over administration of the state court injunction . . . ."  *Gottfried*, 142 F.3d at 331 (citing *McKusick v. City of Melbourne, Fla*, 96 F.3d 478, 488 (11th Cir. 1996)).

Also unlike in *Gottfried*, in this case, permitting the state court the first opportunity to review its injunction would not likely resolve or moot Plaintiffs' constitutional claims.  In *Gottfried*, the injunction prohibiting picketing outside the physician's home and clinic was the only apparent source of the city's policy of arresting anti-abortion protesters who ran afoul of the injunction's terms.  Whereas, the City of Cincinnati's policy of arresting citizens experiencing homelessness sleeping under makeshift shelters for trespassing predates entry of any state-court injunction.  It is the

City's pre-existing Policy 12.111 governing police interactions with the homeless that led Plaintiff Phillips to initiate the instant lawsuit in federal court.  Even assuming the state court *vacated* the Permanent Injunction declaring "illegal encampments" a mobile nuisance, Plaintiffs' fear of arrest for sleeping outside with any sort of covering would persist.  Surely the *Gottfried* court did not envision states preempting federal jurisdiction by initiating an action in state court for injunctive relief *after* a plaintiff files a federal lawsuit challenging the constitutionality of a state policy.  This would be inimical to "the well-established principles that a plaintiff may maintain a § 1983 action without exhausting state judicial remedies or state administrative remedies." *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 900 (6th Cir. 2014) (citations omitted).

In sum, the unique factual and procedural posture of the instant case do not present the sort of concerns for comity and federalism present in *Gottfried*, and sending Plaintiffs to state court would unlikely foster more efficient resolution of the case.  This conclusion is supported by the general wisdom that "where the litigation has already been long delayed, or where it has seemed unlikely that resolution of the state-law question would significantly affect the federal claim . . . abstention should not be required." *Anderson v. Charter Twp. of Ypsilanti*, 266 F.3d 487, 491 (6th Cir. 2001) (discussing *Pullman* abstention) (quoting *Harris Cty. Comm'rs Ct. v. Moore*, 420 U.S. 77, 83-84 (1974)); *see also Quackenbush v. Allstate v. Ins. Co.*, 517 U.S. 706, 716 (1996) (noting that abstention, in general, should be applied only in "exceptional circumstanced").

### C. *Monell* liability for Plaintiffs' § 1983 claims

Plaintiffs bring several constitutional challenges to the City's policy of "citing, arresting, or imprisoning homeless citizens" pursuant to Policy 12.111, the Permanent Injunction, and/or Ohio law.  (Doc. 47 at ¶ 157).  While Plaintiffs allege *Monell* liability pursuant to 42 U.S.C. § 1983 as a separate cause of action, § 1983 is merely a vehicle through which Plaintiffs are able to bring their constitutional challenges against the City. *See Cash v. Hamilton Cty. Dep't of Adult Prob.*, 388 F.3d 539, 542 (6th Cir. 2004). Pursuant to *Monell*, a municipality may be sued under § 1983 when the municipality implements a "policy or custom," *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), that is the "moving force" responsible for the alleged injury.  *Board of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).  Further, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Brown v. Chapman*, 814 F.3d 447, 462 (6th Cir. 2016) (quoting *Board of Cty. Comm'rs v. Brown*, 520 U.S. at 404).

There are four types of claims under which a municipality may be held liable for a constitutional violation: "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of the federal right violations."  *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).

Plaintiffs have sufficiently alleged that the City has a policy of evicting residents experiencing homelessness who are residing in tents or makeshift shelters on public property. First, Policy 12.111, which appears to be an official policy of the Cincinnati Police Department, provides that the police may arrest a person in a homeless encampment and remove their possessions with 72-hours' notice. (Doc. 47-1 at 2). As noted above, it is not clear how Policy 12.111 interacts with the Permanent Injunction based on the City's conflicting representations. At this stage, the Court assumes that Policy 12.111 remains a part of Cincinnati's policy towards homeless residents. (*See* Doc. 51 at 25, 36).

Second, the complaint identifies the Permanent Injunction as a "policy" for purposes of *Monell* liability. The Permanent Injunction issued by the Hamilton County Court of Common Pleas orders the Cincinnati Police Department to clear "the illegal encampments . . . through any lawful means necessary, including arrest" and also orders the Cincinnati Police to maintain public spaces in the City against their use as illegal encampments. (Doc. 47-1 at 9).

The City argues that it does not have discretion regarding whether to enforce the Permanent Injunction and that it cannot be liable for simply following orders. The injunction *orders* the Cincinnati Police Department to clear homeless encampments and maintain public space against future encampments. However, the injunction does not usurp all of Cincinnati's discretion with respect to whether and in what manner it is enforced. The injunction specifically states that the policy is only to be enforced "at all times that space is available in shelters for the homeless." (Doc. 47-1 at 10). The City

27

has taken the position that there is always adequate shelter space available and has therefore indicated its decision and intention to enforce the injunction. (*See* Doc. 51 at 25 ("[T]here was and is adequate shelter space for all individuals at encampments previously subject to Policy 12.111.")). The City has also described Policy 12.111 as "guidance" to its implementation of the injunction—layering on its own interpretation and implementation plan. (Doc. 51 at 25); *see McKusick*, 96 F.3d at 483–84 (finding *Monell* liability adequately pled based on state court injunction that provided the municipality with a level of discretion and where the municipality developed its own policy to guide implementation of the injunction).

Further, Plaintiffs' allegation that the City welcomed the lawsuit filed by the County Prosecutor, and the fact that the City jointly proposed and approved of the terms of the Permanent Injunction, supports a finding that the City has adopted the Permanent Injunction as its official policy towards homeless encampments. (Doc. 47-1 at 11, 196–197); *see Monell*, 436 U.S. at 694 (holding that a local government may be sued for "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy").

Third, Plaintiffs have alleged facts sufficient to support a finding that Cincinnati has a "custom" of removing homeless encampments by threat of arrest. A "custom" under *Monell* must "be so permanent and well settled as to constitute a custom or usage with the force of law." *Cash*, 388 F.3d at 543 (quoting *Doe v. Claiborne Cty.*, 103 F.3d 495, 507 (6th Cir 1996)). Further, it must reflect a course of action deliberately chosen from among various alternatives and must evince a "clear and persistent pattern."

*D'Ambrosio v. Marino*, 747 F.3d 378, 387 (6th Cir. 2014). Plaintiff Phillips alleges that he has sought shelter in hundreds of different outside locations, "but that he has had to abandon those locations because police officers forced him to move or be arrested." (Doc. 47 at ¶ 51). Chin similarly alleges that he has been threatened with arrest while sleeping at various locations downtown. (Doc. 47-1 at 18). The complaint also describes how the City forcibly removed residents under threat of arrest at the Fort Washington Camp on July 27, 2018, including Plaintiff Chin, and then proceeded to essentially chase encampment residents across the City from Third Street to north of Central Parkway to Gilbert Avenue to Thirteenth Street under threat of arrest. (Doc. 47 at ¶¶ 62, 74, 75, 78–81). These facts support a finding that the City has a clear and persistent pattern of evicting homeless residents living outside under threat of arrest.

Construing the facts in the light most favorable to Plaintiffs, the third amended complaint sufficiently alleges that the City has a policy or custom for purposes of *Monell* liability. Whether Plaintiffs have alleged facts sufficient to support a finding that the City's policy or custom violates various provisions of the Constitution will be analyzed separately below.

### D.    First Amendment

The City asserts that Plaintiffs' First Amendment free speech claim should be dismissed because Plaintiffs' conduct is not symbolic speech, and even if it were, the City's limitations on Plaintiffs' conduct are narrowly tailored to protect the City's significant and/or compelling governmental interests. (Doc. 51 at 16–21). Plaintiffs' third amended complaint alleges that "[b]y living on Third Street, along Fort Washington

Way, or anywhere open and obvious to other members of the public, Plaintiffs and putative class members are engaged in symbolic political speech calling attention to the City's affordable housing crisis." (Doc. 47 at ¶ 104). The complaint further alleges that "[b]ecause Plaintiffs and putative class members are engaged in symbolic political speech calling attention to the City's affordable housing crisis, the City's attempt to remove them because their speech makes the City look bad, is a content-based restriction that violates their First Amendment right to speak in a traditionally public forum." (*Id.* at ¶ 106).

The court will first address whether Plaintiffs have pled facts to support a plausible finding that they were engaging in expressive conduct or symbolic speech falling within the ambit of the First Amendment. While the Supreme Court has rejected "the view that an apparently limitless variety of conduct can be labeled 'speech,'" *United States v. O'Brien*, 391 U.S. 367, 376 (1968), it is well-established that the First Amendment's protection "does not end at the spoken or written word," *Texas v. Johnson*, 491 U.S. 397, 404 (1989). To assess whether conduct is "sufficiently imbued with elements of communication" such that it is protected by the First Amendment, courts consider "the nature of [the plaintiff's] activity, combined with the factual context and environment in which it was undertaken . . . ." *Spence v. Washington*, 418 U.S. 405, 409–10 (1974).

More specifically, "[t]o bring a free-speech claim regarding actions rather than words, claimants must show that their conduct 'conveys a particularized message' and [that] 'the likelihood is great that the message will be understood by those who view it." *Blau v. Ft. Thomas Pub. Sch. Dist.* 401 F.3d 381, 388 (6th Cir. 2005) (alternations

30

omitted) (quoting *Spence*, 418 U.S. at 411). This burden is "not a difficult one," and the Supreme Court has clarified that "a narrow, succinctly articulable message is not a condition of constitutional protection." *Id.* (quoting *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995)).

Plaintiffs allege that by living in encampments on Third Street and Fort Washington Way, and "anywhere open and obvious to other members of the public" they are engaging in expressive conduct protected by the First Amendment. (Doc. 47 at ¶ 104). The complaint also asserts that by residing in these visually open spaces, Plaintiffs are "calling attention to the City's affordable housing crisis." (*Id.* at ¶ 106). Based on these allegations, Plaintiffs have sufficiently pled that by living in the encampments, they were conveying a particularized message—that there is an affordable housing crisis in Cincinnati.

Drawing all inferences in favor of Plaintiffs, the complaint also demonstrates "a great likelihood" that the message would be understood by those who viewed the encampments. In *Clark v. Community for Creative Non-Violence*, the Supreme Court assumed without deciding that "overnight sleeping in connection with [a] demonstration is expressive conduct protected to some extent by the First Amendment." 468 U.S. 288, 293 (1984). In addition, several courts have found that sleeping and/or camping in a public park in connection with the "occupy" movement amounts to protected expressive conduct. *See, e.g.*, *Occupy Columbia v. Haley*, 738 F.3d 107, 118-19 (4th Cir. 2013); *Occupy Fort Myers v. City of Fort Myers*, 882 F. Supp. 2d 1320, 1328 (M.D. Fla. 2011) ("The conduct of tenting and sleeping in the park 24 hours a day to simulate an

'occupation' is intended to be communicative and in context is reasonably understood by the viewer to be communicative"); *Occupy Minneapolis v. Cty. of Hennepin*, 866 F. Supp. 2d 1062, 1069 (D. Minn. 2011); *Watters v. Otter*, 955 F. Supp. 2d 1178, 1185 (D. Idaho 2013) ("The act of sleeping in the tents conveys a message of personal commitment and sacrifice to the political cause that is not conveyed by the tent city alone."); *see also Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale*, 901 F.3d 1235, 1238 (11th Cir. 2018) (finding food-sharing in public parks to be expressive conduct protected by the First Amendment).

Living outside in tents is not inherently expressive conduct, such that camping in the woods is not likely to be understood to convey a message about a lack affordable housing—or any other message. In this case, as in the "occupy" cases, the context of Plaintiffs' conduct tips it into First Amendment territory. The complaint describes that up to forty people had been living along Fort Washington Way, and that at several locations, including along Fort Washington and Third Street, people set up tents and other makeshift shelters. (Doc. 47 at ¶¶ 49, 50). As the complaint describes, these locations were purposefully open and obvious to the public, with some encampments located in or near the City's "central business district," leading "the City's more fortunate citizens [to] feel[] . . . shame and guilt," and drawing attention to the City's housing shortage. (*Id.* at ¶¶ 85, 104; Doc. 47-1 at 161, 177). The encampments brought media attention, with the Mayor stating that "[a]llowing *activists to organize homeless camps in the public rights-of-way* poses a direct threat to public health and safety . . . ." (*Id.* at ¶ 63 (emphasis added)). In a news article attached to the complaint, Josh Spring of the

Greater Cincinnati Homeless Coalition "told media the homeless were making a symbolic political statement by being highly visible on a busy downtown street."[7]  (Doc. 47-1 at 128).  In this context, considering the nature and location of the encampments, it is plausible that observers very likely understood that the camps' residents were communicating a message about the City's inability to provide sufficient affordable housing.

The City attempts to distinguish the facts of one "occupy" case, *Freeman v. Morris*, in which the district court found that a "tent city" likely constituted symbolic speech based on the fact that it was part of the national occupy movement.  No. 11-cv-452, 2011 WL 6139216, at *5–6 (D. Me. Dec. 12, 2011).  The Court disagrees that Plaintiffs' conduct "shares none of the indicia of speech present in *Freeman*."  (Doc. 51 at 16).  Like the occupy cases, the conduct at issue here is closely tied to the Plaintiffs' message.  In *Freeman*, the plaintiffs set up a 24-hour-a-day tent city to "occupy" Capital Park in Augusta, Maine with the intention of symbolizing "a permanent occupation that 'challeng[ed] corporations' permanent occupation of the government.'"  2011 WL 6139216, at *1.  Similarly, living in tents in downtown Cincinnati is connected to Plaintiffs' message that there is an affordable housing shortage.

---

[7] Courts assessing a motion to dismiss may consider "exhibits attached [to the complaint], public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein" without converting the motion to one for summary judgment.  *Rondigo, LLC v. Twp. of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011).

The City also points to Phillips' and Chin's statements that they chose to live in the homeless encampments for pragmatic reasons (safety in numbers, closeness to services, etc.) contained in affidavits attached to the complaint.  That there were practical benefits to living in an encampment do not undercut their symbolic value.  As discussed above, the third amended complaint alleges that the encampments were intended to call attention to the City's affordable housing crisis.  (Doc. 47 at 20).  At this stage, the Court accepts those well-pled allegations as true.

Plaintiffs provide additional factual details in their response brief, including that on August 3, 2018, Plaintiffs, the putative class members, and other activists and sympathizers held banners and placards in protest of their imminent eviction.  (Doc. 53 at 7).  Yet, those details are not contained in the complaint, and thus, the Court does not consider them for purposes of evaluating the City's motion to dismiss.  *See Johnson v. Metro. Gov't of Nashville & Davidson Cty.*, 502 F. App'x 523, 541–42 (6th Cir. 2012) ("The Court may not . . . take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a)") (quoting in a parenthetical Moore's Federal Practice § 12.34).  Regardless, it is plausible that Plaintiffs were engaging in symbolic speech without these details.

As a further note, the City appears to misunderstand the nature of Plaintiffs' First Amendment claim based on its assertion that the additional facts related to August 3, 2018 clarify that Plaintiffs' First Amendment claim relates only to their speech *on that day*.  (Doc. 55 at 7).  To the contrary, the complaint alleges that plaintiffs were engaged

in protected conduct on other days and at other locations: "By living on Third Street, along Fort Washington Way, *or anywhere open and obvious* to other members of the public, Plaintiffs and putative class members are engaged in symbolic speech . . . ." (Doc. 47 at ¶ 104). Moreover, Plaintiffs are not seeking damages for a single, past First Amendment violation, but are rather bringing an as-applied challenge to prevent further injury by enjoining the City from enforcing Policy 12.111 and the Permanent Injunction. (*See id.* at ¶ 110) ("In the absence of the injunctive relief sought, Plaintiffs and the putative class will either refrain from protected speech, or be cited and arrested in violation of their First Amendment right . . . .").

Next, the Court will analyze whether Plaintiffs have adequately pled a First Amendment claim in light of the City's argument that even assuming Plaintiffs' conduct is protected by the First Amendment, the Permanent Injunction and/or Policy 12.111 are constitutional restrictions on speech.[8] (Doc. 51 at 17). Generally, content-based restrictions on speech "can stand only if they satisfy strict scrutiny." *Planet Aid v. City of St. Johns*, 782 F.3d 318, 326 (6th Cir. 2015) (alterations omitted) (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 811 (2000)). Regulations on the time, place, and manner of speech as well as content-neutral regulations of *conduct* that incidentally burden speech are analyzed under an intermediate level of scrutiny. *Id.* (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994)); *Richland Bookmart, Inc. v. Knox*

---

[8] The Court interprets Plaintiffs' First Amendment claim as premised on both Policy 12.111 and the Permanent Injunction. The amended complaint is vague as to which policy the claim is based upon, and the parties address both policies in their briefing.

*Cty. Tenn.*, 555 F.3d 512, 521 (6th Cir. 2009) (citing *United States v. O'Brien*, 391 U.S. 367, 376–77 (1968)).

At first blush, both Policy 12.111 and the Permanent Injunction, which prohibit homeless encampments, appear to fall under the latter category—a regulation of conduct that incidentally burdens speech—which would be subjected to intermediate scrutiny under the test set forth in *O'Brien*. However, the Supreme Court has established a heightened test for content-neutral *injunctions* that burden speech. In *Madsen v. Women's Health Center*, the Court held that a state-court injunction imposing time, place, and manner restrictions on a group of anti-abortion activists, though content-neutral, should be subject to a heightened level of scrutiny based on the unique attributes of injunctions as compared to generally applicable laws. 512 U.S. 753, 764 (1994). The Court noted that while "[o]rdinances represent a legislative choice regarding the promotion of particular societal interests[,] [i]njunctions, by contrast, are remedies imposed for violations (or threatened violations) of a legislative or judicial decree." *Id.* Based on this difference, the Court found that "[i]njunctions . . . carry greater risks of censorship and discriminatory application than do general ordinances." *Id.* Thus, to the extent Plaintiffs' First Amendment claim relies on Policy 12.111, it will be assessed under the intermediate standard set forth in *O'Brien*, and to the extent it relies on the City's enforcement of the Permanent Injunction, it will be assessed under the heightened standard established by *Madsen*.

However, before applying these separate standards, the Court must first determine whether the policies are indeed content-neutral, because if either is related to the content

of the expression, it would fall outside the scope of either *O'Brien* or *Madsen* and be subjected to strict scrutiny.  *See Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 652 (6th Cir. 2007).  Determining whether a regulation is content neutral "is not always a simple task."  *Planet Aid*, 782 F.3d at 326 (quoting *Turner Broad. Sys.*, 512 U.S. at 642). The Court must first examine whether the regulation "'on its face' draws distinctions based on the message a speaker conveys."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 564 (2011)).

Policy 12.111, which permits the police to arrest a person living in a homeless encampment for trespass after a 72-hour notice period does not, on its face, take into account whether the person residing outside in a tent or makeshift shelter is attempting to convey a message, nor does the Policy draw distinctions based on the message conveyed. (Doc. 47-1 at 2–4).  The Permanent Injunction similarly appears content neutral on its face.  The Court in *Madsen* held that the fact than an injunction necessarily applies only to the parties singled out in the injunction (and their aiders and abettors), does not automatically render the injunction content based.  512 U.S. at 762.

Having determined that the policies are facially content neutral does not end the inquiry—the Court must next examine the purpose of the policies to discern whether the they can be "justified without reference to the content of the regulated speech" or "were adopted by the government 'because of disagreement with the message [the speech] conveys.'"  *Reed*, 576 U.S. at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).  "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not

37

others." *Ward*, 491 U.S. at 791 (quoting *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–48 (1986)).

The City has set forth a number of interests in support of its ban on homeless encampments: "ensuring public rights of way have sufficient egress for passersby; maintaining sidewalks in compliance with the Americans with Disabilities Act; and [ ] preventing the nuisance conditions and illegal conduct that arise at unpermitted encampments." (Doc. 51 at 19). The text of the Permanent Injunction deems "the illegal encampments" a nuisance that "constitute a hazard to the health and safety of the general public . . . ." (Doc. 47-1 at 7). Policy 12.111 states that its purpose is "[t]o provide guidance for all officers to ensure the fair and equitable treatment of homeless persons" and "[t]o ensure that notice is given to those who are unlawfully trespassing on public property and that personal property is safeguarded according to law and Department procedure." (Doc. 47-1 at 2). Both sets of justifications can be explained without reference to Plaintiffs' expressive conduct or the content of their message.

Plaintiffs challenge the validity of City's justifications and allege that the City sought to remove Plaintiffs "because their speech makes the City look bad" and that "Defendants' conduct was intended to silence speech with which it disagrees . . . ." (Doc. 47 at ¶ 109). However, the Sixth Circuit has rejected attempts to look past stated justifications of otherwise facially neutral regulations of conduct to uncover an "illicit motive." *See Bailey v. Callaghan*, 715 F.3d 956, 960 (6th Cir. 2013) ("It is a familiar principle of constitutional law that this Court will not strike down an otherwise

constitutional statute on the basis of an alleged illicit legislative motive.") (quoting *O'Brien*, 391 U.S. at 383).

Having found that Plaintiffs have not alleged facts to support finding that the policies are content based, the Court will proceed to consider the City's argument that the Policy and Permanent Injunction are constitutional restrictions on speech as a matter of law under application of the intermediate scrutiny test of *O'Brien* and the heightened scrutiny test of *Madsen*, respectively.

### 1.  Policy 12.111

Policy 12.111 falls under the *O'Brien* intermediate scrutiny test.  In *O'Brien*, the Court "applied [the test] to a regulation of general conduct (a prohibition on the destruction of Selective Service draft cards) that incidentally burdened 'symbolic speech' or 'expressive conduct' (the burning of a draft card to protest the war)." *Richland Bookmart, Inc.*, 555 F.3d at 521.  A content-neutral regulation does not violate the First Amendment "[1] if it furthers an important or substantial governmental interest; [2] if the governmental interest is unrelated to the suppression of free expression; and [3] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Turner Broad. Sys.*, 512 U.S. at 662 (quoting *O'Brien* 391 U.S. at 377).  The third requirement of narrow tailoring is satisfied "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* (quoting *Ward*, 491 U.S. at 799).

The City has identified several substantial interests furthered by Policy 12.111, including preventing nuisance conditions and preserving rights of way.  (Doc. 51 at 19).

*See, e.g.*, *Clark*, 468 U.S. at 296 (finding government had substantial interest in maintaining parks in Nation's capital); *First Vagabonds Church of God v. City of Orlando*, 638 F.3d 756, 762 (11th Cir. 2011) (city has substantial interest in managing parks). The question of whether the substantial government interests are unrelated to the suppression of expression is largely redundant of the test for content-neutrality applied above. *See Project Veritas v. Ohio Election Comm'n*, 418 F. Supp. 3d 232, 259 (S.D. Ohio 2019) ("The Court has already found that the statute here is content-neutral and thus finds it is unrelated to the suppression of free expression."). The Court, therefore, repeats its finding above that the interests put forth by Cincinnati are not related to the suppression of Plaintiffs' message regarding the City's affordable housing crisis.

Plaintiffs attack the necessity and efficacy of the Policy, expressing doubt that the City's alleged interest in abating public health risks will be served by "dispersing those afflicted to areas where they cannot be found . . . ." (Doc. 47 at ¶ 108). However, in *Richland Bookmart*, the Sixth Circuit clarified that "[a] content-neutral regulation of conduct, such as the prohibition on public nudity or on the destruction of draft cards, 'require[s] no evidentiary showing at all that the threatened harm was real.'" 555 F.3d at 522 (emphasis added) (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 299 (2000)). For example, in *O'Brien*, "it was enough, . . . that Congress took 'official notice, as it were, that draft card destruction would jeopardize the [Selective Service] system,' and no further evidence or studies were required." *Id.* (quoting *City of Erie*, 529 U.S. at 299).

Cincinnati's Policy 12.111 prohibits a broad category of conduct (residing in tents or other shelters outside) and incidentally burdens symbolic speech (the use of tents or

shelters to convey a message). The Policy does not mention the use of erecting or residing in tents as a means of expression or symbolic conduct. Thus, the policies do not *actually regulate expressive conduct*. Rather, the general ban has an incidental effect on symbolic conduct, as those who wish to erect tents as a means of expression are not able to do so. Consequently, the City is not required to make an evidentiary showing to support its stated justifications for the Policy.

Accordingly, Plaintiffs' arguments attacking the validity of the Policy are not relevant to the constitutional analysis. (*Id.* at ¶ 108). Further, because the City is not required to make an evidentiary showing to justify the Policy, it is appropriate to address whether the City has met the *O'Brien* factors on the pleadings, as a matter of law. *Cf. Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 297 (6th Cir. 2008) (finding plaintiff not entitled to discovery to refute the defendant's justification for ordinance restricting sexually oriented businesses); *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010) ("[A] motion for dismissal pursuant to Rule 12(b)(6) will be granted if the facts as alleged are insufficient to make a valid claim or if the claim shows on its face that relief is barred by an affirmative defense.").

The only remaining inquiry under *O'Brien* is whether the Policy is narrowly tailored, or "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Turner Broad. Sys.*, 512 U.S. at 662 (quoting *Ward*, 491 U.S. at 799). First, it can be said that the City's aim of preserving public space and preventing nuisance conditions would be "achieved less effectively absent the [Policy]" permitting the police to arrest homeless individuals encamped on public property. *Id.*

(quoting *Ward*, 491 U.S. at 799). Second, Policy 12.111 does not "burden substantially more speech than is necessary to further the government's legitimate interest." *Id.* (quoting *Ward*, 491 U.S. at 799). The Policy leaves open other avenues for protesting the City's lack of affordable housing, such as petitioning, marching, and hosting rallies (that do not involve residing in tents).

Accepting the alleged facts as true and construing the complaint in the light most favorable to Plaintiffs, Plaintiffs have failed to assert a plausible First Amendment claim challenging the City's enforcement of Policy 12.111, and the City is entitled to judgment as a matter of law. *See Iqbal*, 556 U.S at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

### 2. Permanent Injunction

Nevertheless, Plaintiffs have pled a plausible First Amendment claim based on the City's enforcement of the Permanent Injunction. The injunction is assessed under the heightened scrutiny test set forth in *Madsen*, which requires that "the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." 512 U.S. at 765. While the City has set forth significant government interests furthered by the injunction that are unrelated to Plaintiffs' message, the Court agrees with Plaintiffs that at this stage, it would be premature to weigh the evidence presented by the City in support of the injunction and to consider whether the injunction "burden[s] no more speech than necessary" to carry out that purpose. *See*

*Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 452 (6th Cir. 2003) (noting that it is not the function of the court at the motion to dismiss stage to weigh the evidence).

The injunction is broad; it does not define "illegal encampments" and seemingly prohibits the homeless residents targeted by the injunction from so much as setting up any sort of tent or makeshift shelter for any period of time, at anytime, anywhere in the City.  In other cases, municipalities have turned to measures like curfews and restrictions on activities like sleeping and cooking in tents, and only in certain areas, to address health and safety concerns posed by demonstrators' use of tents.  *See, e.g.*, *Occupy Nashville v. Haslam*, 769 F.3d 434, 436 (6th Cir. 2014) (assessing curfew in one park); *Occupy Minneapolis*, 866 F. Supp. 2d at 1066–67 (considering county resolution prohibiting sleeping and leaving items unattended in certain plazas adjacent to the county government offices).

At this stage, the Court accepts as true Plaintiffs' allegations that they were using the encampments as a means of symbolic speech, and it is plausible based on the allegations in the complaint that observers understood that Plaintiffs were communicating a message about Cincinnati's homelessness crisis.  With that in mind, and considering the breadth of the injunction, Plaintiffs have sufficiently pled a First Amendment claim with respect to the City's enforcement of the Permanent Injunction.

### E.    Fourth Amendment

The City also asserts that Plaintiffs' Fourth Amendment unreasonable seizure claim should be dismissed for failure to state a claim.  The third amended complaint challenges Policy 12.111 as unconstitutional under the Fourth Amendment, because it

permits the police to seize "persons and their property based solely on their presence in a public space or on public property, or based solely on their status as citizens experiencing homelessness." (Doc. 47 at ¶ 113). More specifically, the complaint alleges that on July 27, 2018, "the City threatened with arrest the citizens living in the Fort Washington Camp and then destroyed their property, without regard for whether it was *bona fide* trash." (*Id.* at ¶ 62). It also notes that Plaintiff Chin's property, in particular, "was destroyed and or seized by the City when it forcibly removed those living at the Fort Washington Camp." (*Id.* at ¶ 52).

Plaintiffs seek a declaration that Policy 12.111 violates the Fourth Amendment, a Permanent Injunction prohibiting the City from enforcing Policy 12.111, as well as monetary damages for Plaintiffs' property that has been lost, damaged, or destroyed.[9] (*Id.* at 31).

Policy 12.111 provides that the police will allow 72 hours' notice "prior to arrest [for trespassing] and removal of personal possessions from a homeless encampment, provided the homeless person provides proper identification, is not violating any other

---

[9] The section of the complaint setting forth the Fourth Amendment claim (Count II) only references Policy 12.111 (and not the Permanent Injunction). (Doc. 47 at ¶¶ 111-115). In addition, the City notes in its motion to dismiss that Plaintiffs' Fourth Amendment claim only relies on Policy 12.111 and does not address the Permanent Injunction. In response, Plaintiffs continue to rely exclusively on Policy 12.111 for their Fourth Amendment argument. Consequently, the Court interprets Plaintiffs' Fourth Amendment claim to be premised on Policy 12.111 only, and not the City's enforcement of the Permanent Injunction.

Additionally, although the complaint challenges the City's alleged unlawful seizure of "persons" in violation of the Fourth Amendment, an assertion the City refutes in it motion to dismiss, Plaintiffs' response focuses solely on the seizure of property. Thus, Plaintiffs have abandoned their Fourth Amendment claim with respect to unlawful seizure of persons. *See Thornton*, 171 F. Supp. 3d at 705 (citing *Humphrey*, 279 F. App'x at 331).

law, and exigent circumstances do not exist." (Doc. 47-1 at 2). The notice is to be

provided in the form of a "Notice Letter issued to each person at the encampment"

"reflect[ing] that minimum period of time to gather his possessions and depart." (*Id.*).

The 72-hour period does not include weekends or holidays. (*Id.*). Notice is also provided

to the Cincinnati Homeless Coalition so that it may provide necessary services. (*Id.*).

Further, the Policy instructs responding officers to "inspect the immediate area for health

and/or safety violations that require immediate attention to avoid harm to persons" and to

"[t]ake immediate action on observed legal violations." (*Id.* at 3). Moreover, the Policy

states that "[i]f the only legal violation observed is trespassing on public property, then

this procedure will be followed." (*Id.* at 2). The last section of the Policy entitled

"Handling and Disposition of Property at a Homeless Encampment," states as follows:

a.   If the homeless person(s) chooses to depart rather than face arrest,
they shall be encouraged to take all their personal property and
possessions with them. Reasonable efforts shall be made to assist
them in this endeavor.

b.   Property located at the encampment site after all persons have
departed, either voluntarily or by arrest, shall be assessed:

1)   Items that are spoiled or mildewed shall be considered trash.
Appropriate arrangements shall be made to have the area
cleaned up.

2)   Personal items that are/were owned by the departed
trespassers that do not fit the criteria above, such as clothing,
photographs, personal papers, and keepsakes, shall be
processed into Court Property as Found/Hold for Owner.

(*Id.* at 4).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  A seizure of property occurs for purposes of the Fourth Amendment when "there is some meaningful interference with an individual's possessory interest in that property."  *Soldal v. Cook Cty.*, 506 U.S. 56, 61 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).  The collection or destruction of a homeless person's unattended property constitutes an interference with that person's possessory interest, implicating the Fourth Amendment.  *Lavan v. City of L.A.*, 693 F.3d 1022, 1030 (9th Cir. 2012) (finding high likelihood that "collecting and destroying [the plaintiffs' unattended] property on the spot" constitutes unreasonable seizure); *Proctor v. D.C.*, 310 F. Supp. 3d 107, 114 (D.D.C. 2018).  At the same time, the seizure of property that has been abandoned does not implicate the Fourth Amendment.  *Abel v. United States*, 362 U.S. 217, 241 (1960) (finding warrantless seizure of items abandoned in hotel room trashcan did not violate the Fourth Amendment); *Proctor*, 310 F. Supp. at 114.  In order to assess the reasonableness of a seizure, courts "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion."  *Autoworld Specialty Cars, Inc. v. United States*, 815 F.2d 385, 389 (6th Cir. 1987) (quoting *Jacobsen*, 466 U.S. at 125).

The City asserts that Policy 12.111 does not permit "unreasonable" seizures of property in violation of the Fourth Amendment because it provides residents an adequate opportunity to remove their possessions.  More specifically, the City points to the fact

that the Policy requires 72-hours' notice and a final opportunity to remove items if, after that 72-hour period, the resident chooses to voluntarily depart rather than be arrested. (Doc. 47-1 at 4). Items left behind after a resident is either arrested or voluntarily departs are processed into Court property as "Found/Hold for Owner," unless the item is soiled or mildewed. (*Id.*).

In response, Plaintiffs assert that the City *did not* provide notice to either the Greater Cincinnati Homeless Coalition or Chin of its intent to invade the Fort Washington Camp on July 27, 2018, resulting in the destruction of Chin and other Fort Washington Camp residents' property without regard for whether it was bona fide trash.[10] (Doc. 47 at ¶ 62; Doc. 53 at 11). Yet, because Plaintiffs' claim is against the City pursuant to *Monell*, Plaintiffs must allege the City has a custom or policy of engaging in the sort of constitutional violations they contend occurred during the Fort Washington eviction. The single deviation from the Policy that allegedly occurred at the Fort Washington camp does not demonstrate that the City has a policy of failing to provide

---

[10] In their reply brief, Cincinnati asserts that as a "trespasser" Chin had "no legitimate expectation of privacy." (Doc. 55 at 9). Defendant conflates the tests for searches and seizures under the Fourth Amendment. While a "search" occurs "when the government intrudes upon an expectation of privacy," as explained above, a "seizure" of property "occurs when there is some meaningful interference with an individual's possessory interests in that property." *Jacobsen*, 466 U.S. at 113. Thus, Plaintiffs "need not show a reasonable expectation of privacy to enjoy the protection of the Fourth Amendment against seizures of their unabandoned property." *Lavan*, 693 F.3d at 1027-28. In addition, the protections of the Fourth Amendment do not abate when the person whose property is being seized has violated a city policy or state law. *Id.* at 1029–30.

notice and of destroying unabandoned property.[11] Thus, even assuming Chin did not have notice of the Fort Washington eviction and that the City threw away the Fort Washington camp residents' possessions, that event alone cannot support Plaintiffs' Fourth Amendment claim under *Monell*.

This case does not resemble other cases in which plaintiffs have successfully pled that a city's policy or custom led to the unlawful seizure or destruction of homeless residents' unattended property. For example, in *Proctor v. District of Columbia*, the court found homeless residents adequately alleged "facts to show that the District has a custom of destroying unattended—but not abandoned—property." No. 1:18-cv-701, 2018 WL 6181739, at *3 (D.D.C. Nov. 27, 2018). In that case, the plaintiffs alleged that the District's posted signs informing residents of scheduled "cleanings" of homeless encampments noticed the wrong date or time, leading to the inadvertent destruction of unattended property. *Id.* The plaintiffs also alleged that the District unreasonably considered property abandoned when a resident was absent during the cleaning or left the site after the cleaning began, and that the District's signage "misleads homeless residents about how the District will treat certain unattended items." *Id.* Similarly, in *Sullivan v. City of Berkeley*, the court permitted the plaintiffs' Fourth Amendment claims to proceed

---

[11] A single act by a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action ordered" may be sufficient to show a policy or custom. *Cady v. Arenac Cty.*, 574 F.3d 334, 345 (6th Cir. 2009) (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 481 (1986)). But Plaintiffs do not allege that a final decision-maker ordered or condoned the evacuation of the Fort Washington camp without notice or the destruction of the residents' property. Moreover, the alleged violations at the Fort Washington camp constitute a deviation from the City's written policy. *See Gailor v. Armstrong*, 187 F. Supp. 2d 729, 734 (W.D. Ky. 2001) ("It is only common sense that one incident of policy deviation, however flagrant, cannot establish custom.").

beyond the pleading stage where the plaintiffs alleged facts showing the city, on multiple occasions, "collect[ed] and store[d] property without notice, and in a way that [did] not allow plaintiffs to retrieve it in a usable condition (or at all)." No. 17-06051, 2018 WL 489011, at *4 (N.D. Cal. Jan. 19, 2018).

Moreover, Plaintiffs do not adequately plead a facial challenge to Policy 12.111. In response to the City's assertion that Policy 12.111 is constitutional on its face in light of the notice requirement and other safeguards, Plaintiffs do not challenge any aspect of Policy 12.111 as inadequate to protect homeless residents' interest in their unabandoned property, such as insufficient notice. Accordingly, Plaintiffs have not adequately pled a facial Fourth Amendment challenge to Policy 12.111.[12] *See, e.g.*, *Cobine v. City of Eureka*, 250 F. Supp. 3d 423, 435 (N.D. Cal. 2017) (finding plaintiffs failed to adequately plead a Fourth Amendment claim where the plaintiffs challenged, on its face, the section of an ordinance providing 24-hour notice prior to impounding personal property to be stored for a period of 90 days prior to destruction).

The complaint's general assertion that Policy 12.111 permits the police to unreasonably seize property of homeless citizens "based solely on their presence in a public space or on public property" or "based solely on their status as citizens experiencing homelessness" cannot carry the claim past the pleading stage. (Doc. 47 at ¶¶ 112, 113). Plaintiffs do not assert how the terms of Policy 12.111 violate the Fourth

---

[12] As stated above, Plaintiffs' Fourth Amendment claim relates only to Policy 12.111, and not the Permanent Injunction, which does not appear to require notice prior to the "clearing" of "illegal encampments." (Doc. 47-1 at 9).

Amendment, and instead focus on the police's ability to target the homeless for trespassing, which is the subject of another of Plaintiffs' claims.[13]  Because Plaintiffs have failed to adequately allege that the City has a policy of seizing or destroying homeless residents' unabandoned items and have failed to adequately plead a facial challenge to Policy 12.111, Defendants' motion to dismiss Plaintiffs' Fourth Amendment claim is granted.

### F.    Fourteenth Amendment Due Process

#### 1.  Procedural Due Process

Next, the City asserts that Plaintiffs have failed to adequately allege a procedural due process claim.  For purposes of this claim, the Court understands Plaintiffs to be challenging both Policy 12.111 and the Permanent Injunction.  The parties address both policies in their memoranda, and the section of the third amended complaint setting forth the due process claim (Count III) challenges the City's failure, generally, to provide sufficient pre- and post-deprivation notice regarding the collection or destruction of Plaintiffs' property.  (*Id.* at ¶¶ 116-121).  Plaintiffs seek injunctive relief to prevent their personal property from being taken in the future without due process.  (*Id.* at ¶ 121).

The City argues that Plaintiffs have failed to state a plausible due process claim in light of the many procedural safeguards provided for in Policy 12.111 and the Permanent Injunction.  Despite the City's multiple assertions throughout its briefing that Policy

---

[13] Because Plaintiffs have not alleged that Policy 12.111 does not adequately protect against the seizure of unabandoned property, their arguments that the City's business interests do not outweigh Plaintiffs' possessory interests are not relevant.

12.111 has been "superseded" by the Permanent Injunction (*see, e.g.*, Doc. 51 at 9, 11, 36), with respect to its due process argument, the City takes the position that the Permanent Injunction "governs the City's response to homeless encampments[,]" with Policy 12.111 "provid[ing] guidance with respect to its enforcement."  (*Id.* at 25).  This is likely because Policy 12.111 provides several procedural safeguards, outlined in detail above, namely a 72-hour notice requirement prior to collecting a homeless resident's possessions and the requirement that unsoiled items be "processed into Court Property as Found/Hold for Owner."  (Doc. 47-1 at 4).

The Permanent Injunction, which deems "illegal encampments" a nuisance, does not require that notice be provided prior to the police "clearing" the encampments and seizing any remaining property.  The injunction states that "any tent or other shelter found on the premises" (public property in Cincinnati) "shall be seized by the City and stored for a period of 60 days and, if not claimed by the owner, seized property may be disposed of by the City."  (Doc. 47-1 at 9).  It further instructs that "all items remaining on the premises shall be inventoried and stored" with "[i]tems that are reasonably considered soiled or garbage and refuse . . . [to be] discarded . . . ."  (*Id.*).  The injunction also permits the Cincinnati Police to "remove and secure at an off-site location highly mobile and valuable property including, but not limited to, such personal property as cash, jewelry, and electronic equipment" to be "claimed by the owner at any time, subject to pre-existing hours of operation."  (*Id.*).

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  Courts assessing a procedural due

process claim must first determine whether the plaintiff has a property interest entitled to due process protection, and if so, what amount of process is required.  *Mitchell v. Fankhauser*, 375 F.3d 477, 480 (6th Cir. 2004).  It is well established that people have "a protected property interest in their own items of value."  *Cash*, 388 F.3d at 542; *accord Lavan*, 693 F.3d at 1032 ("The government may not take property like a thief in the night; rather, it must announce its intentions and give the property owner a chance to argue against the taking.  This simple rule holds regardless of whether the property in question is . . . a Cadillac or a cart.") (quoting *Clement v. City of Glendale*, 518 F.3d 1090, 1093 (9th Cir. 2008)).  Further, violation of a city ordinance or state law does not eliminate a person's property interest.  *Lavan*, 693 F.3d at 1032 (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982)).

Generally, "individuals whose property interests are at stake are entitled to [ ] 'notice and [an] opportunity to be heard."  *Cash*, 388 F.3d at 544.  In the context of the collection or destruction of the possessions of people experiencing homelessness that are left unattended in a public space, courts have found that minimally, the municipality must provide advance notice and a meaningful way to collect the property.  *See, e.g.*, *O'Callaghan v. City of Portland*, No. 3:12-cv-201, 2013 WL 5819097, at *4 (D. Or. Oct. 29, 2013) (finding sufficient due process where plaintiff cited for illegal camping was given 24 hours' notice and phone number to retrieve items); *Cobine v. City of Eureka*, No. 16-02239, 2016 WL 1730084, at *4 (N.D. Cal. May 2, 2016) (due process likely adequate with advance notice and ability to reclaim property by calling to schedule an appointment within 90 days of removal); *Mitchell v. City of Los Angeles*, No. 16-01750,

2016 WL 11519288, at *5 (C.D. Cal. Apr. 13, 2016) (finding high likelihood of success on merits where confiscated property not stored in readily accessible facility); *De-Occupy Honolulu v. City & Cty. of Honolulu*, No. 12-00668 , 2013 WL 2285100, at *6–7 (D. Haw. May 21, 2013) (due process likely adequate where city provided 24 hours' notice and post-seizure notice describing the items and informing of location where they may be retrieved).

Plaintiffs have adequately pled that the City has a policy of failing to provide adequate pre-deprivation notice.  While Policy 12.111 provides for 72 hours' notice, it is not clear that the City will continue to enforce that notice requirement in light of the subsequent Permanent Injunction, which does not require any amount of notice prior to "clearing" homeless encampments.  It is reasonable to infer that the City no longer has a policy of providing pre-deprivation notice based on the allegations in the complaint describing how the City police cleared prior encampments the same day the state-court injunctions were issued.  (*See, e.g.*, Doc. 47 at ¶ 79 ("That same day . . . shortly before 10:00 p.m., Cincinnati Police officers forced the relocated residents to evacuate their Gilbert Avenue campsite under threat of arrest . . . .")).  Construing the complaint in the light most favorable to the Plaintiffs, the complaint adequately alleges a procedural due process claim based on a lack of adequate pre-deprivation notice.

Further, while Policy 12.111 and the Permanent Injunction require the City police to store any remaining unsoiled items, the text of both policies do not indicate that there is a process for retrieving those items.  Policy 12.111 states that the items will be

processed into court property as "Found/Hold for Owner," and the Permanent Injunction simply states that remaining items "shall be inventoried and stored."  (Doc. 47-1 at 4, 9). Equally concerning is the fact that a retrieval process is not communicated to encampment residents.  A sample notice attached to the third amended complaint does not indicate that remaining items will be stored for collection.  (Doc. 47-1 at 116).  It also does not provide information concerning the location where the items will be stored or a phone number to arrange for the retrieval of the items.[14]  (*Id.*).  Thus, Plaintiffs have pled a plausible procedural due process claim based on the City's failure to provide both adequate pre- and post-deprivation process.

The City's argument that Plaintiffs must challenge the adequacy of state law in order to mount a federal due process is misplaced.  The requirement established in *Parratt v. Taylor* that a plaintiff demonstrate the inadequacy of state remedies, 451 U.S. 527, 541-43 (1981), applies only to claims involving "random, unauthorized deprivations of property" as opposed to deprivations that occur pursuant to state policies or procedures, *Mitchell v. Frankhauser*, 375 F.3d 477, 481-84 (6th Cir. 2004).  Here, Plaintiffs' constitutional due process claim is against the City based on *Monell* liability, and thus, necessarily challenges the adequacy of due process pursuant to the City's policy, as opposed to a random and unauthorized deprivation by a rogue officer.

---

[14] The notice does contain the phone number of the Cincinnati Coalition for the Homeless, but it is not alleged by the City nor clear on the face of the notice that the Coalition, a Plaintiff in this lawsuit, had anything to do with the property retrieval process.

### 2.  Substantive Due Process

In addition to Plaintiffs' procedural due process claim and state-created danger claim, which is grounded in substantive due process (addressed below), Plaintiffs raise an additional substantive due process claim by alleging that "[w]ithout adequate shelter for all its citizens experiencing homelessness, the City arrests some while allowing others to go free in an arbitrary and capricious exercise of authority that so shocks the conscience no amount of pre-deprivation or post-deprivation process is sufficient to protect the constitutional rights of those affected."  (Doc.47 at ¶ 120).

"The doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed has come to be known as substantive due process."  *Bowers v. City of Flint*, 325 F.3d 758, 763 (6th Cir. 2003) (quoting *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992)).  "One aspect of substantive due process is the right to be free of 'arbitrary and capricious' action by government actors."  *Id.* (quoting *Pearson*, 961 F.2d at 1217).  In order to allege a substantive due process violation, a plaintiff must assert either the "'denial of a right, privilege, or immunity secured by the Constitution or by federal statute' or an official act which 'shocks the conscience of the court.'"  *Id.* at 764 (Moore, J., concurring) (quoting *Mertik v. Blalock*, 983 F.2d 1352, 1367–68 (6th Cir. 1993)).

Plaintiffs appear to be asserting the latter type of substantive due process claim—that the City's enforcement of Policy 12.111 and the Permanent Injunction is "so 'egregious' that it can be said to be 'arbitrary' in the constitutional sense" and "shocks the conscience."  *Id.* at 767 (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th

Cir. 2002)). The City describes this claim as "cursory" and unsupported based on the availability of shelter space. (Doc. 51 at 26). In other words, the City appears to be arguing that its policy towards homeless encampments does not "shock the conscience," because the City will not threaten with arrest or arrest a person experiencing homelessness for sleeping outside in a tent unless that person has access to shelter.

As is discussed in greater detail below, Plaintiffs have adequately alleged a substantial risk that the City will enforce its policy *when there is not shelter space available*. Plaintiffs allege that there is a chronic shortage of shelter space in the City, and that in addition, individual shelter rules often preclude a particular individual's eligibility to stay in a given shelter. (Doc. 47 at ¶¶ 24–46, 48). At this stage, the Court must accept Plaintiffs' well-pled allegations as true and is not in a position to weigh the credibility of competing testimonial evidence concerning the availability of shelter space in Cincinnati, especially for those ineligible to sleep at a shelter. Plaintiffs provide ample data, as well as affidavits of the Plaintiffs to support their allegations concerning the lack of shelter space in Cincinnati. Because the City does not otherwise attack this claim, dismissal is not warranted at this time. *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) ("The defendant has the burden of showing that the plaintiff has failed to state a claim for relief.").

### 3. State-Created Danger

The City asserts that Plaintiffs' state-created danger claim should be dismissed as insufficiently pled. A state-danger claim arises under the Due Process Clause of the Fourteenth Amendment. *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006).

Plaintiffs' claim is premised on the theory that when a state "cause[s] or greatly increase[s] the risk of harm to its citizens . . . through its own affirmative acts[,]" it has created a "'special danger' and a duty to protect its citizens from that risk." *Id.* at 690 (quoting *Kallstrom v. City of Columbus*, 36 F.3d 1055, 1066 (6th Cir. 1998)).  To bring a state-created danger claim, a plaintiff must allege: "(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff." *Id.* (quoting *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)).

Plaintiffs' third amended complaint alleges that "[b]y threatening to take and destroy Plaintiffs' and the putative class' tents, tarps, blankets, and clothing, and by ordering Plaintiffs and the putative class members to vacate public land, the City has created a danger for the Plaintiffs by exposing them to harsh weather elements."  (Doc. 47 at ¶ 152).  The complaint further alleges that "[b]y forcing Plaintiffs and the putative class to abandon encampments located in well-lit and high-traffic areas, Defendants have created a threat of violence and victimization by other members of the public."  (*Id.* at ¶ 154).  In addition, Plaintiffs claim that the City "knew, or should have known, that citizens experiencing homelessness are more likely than other members of the public to be the victims of violent crime and or property crime."  (*Id.*).

The City first argues that Plaintiffs' claim fails because *threatening* to take and destroy Plaintiffs' property does not constitute an affirmative act that would increase a risk of harm to Plaintiffs.  (Doc. 51 at 35).  The Court agrees that the mere threat of taking Plaintiffs' property is an insufficient basis for a state-danger claim.  However, Plaintiffs also allege that the City "order[ed] Plaintiffs and the putative class members to vacate public land" and "forc[ed] Plaintiffs and the putative class to abandon encampments located in well-lit and high-traffic areas."  (Doc. 47 at ¶¶ 152, 154).  Thus, Plaintiffs have adequately alleged that the City took an affirmative act.  *Cartwright*, 336 F.3d at 493.

Next, the City asserts that it has not increased the risks of harm associated with living outside by enforcing Policy 12.111 and the Permanent Injunction, because those policies were "designed to connect [Plaintiffs] with shelter and service providers."  (Doc. 51 at 35).  However, that the City's policies were well-intentioned does not refute Plaintiffs' allegation that as a result the City's enforcement of the policies, Plaintiffs have been forced to reside in more secluded and dangerous locations.  (Doc. 47-1 at 18).

The City also argues that the enforcement of its homeless encampment policy does not increase the risk of harm to Plaintiffs of violence and victimization, and that Plaintiffs have failed to establish "they were safer in the encampment than at a shelter or elsewhere."  (Doc. 51 at 35).  First, because Plaintiffs allege that they do not have access to permanent shelter, the City presents a false comparison between the safety of a homeless encampment and the safety of a shelter.  Plaintiffs allege in their complaint and attached affidavits that without access to shelter, they continue to sleep outside, but in

58

more secluded and dangerous locations.  (Doc. 47-1 at 14, 18–19).  Moreover, the question is whether the City's enforcement of its encampment policies *increases* the risk of harm to Plaintiffs.  That sleeping in an encampment is not free of risks does not preclude Plaintiffs' argument that sleeping in more isolated and secluded areas to avoid arrest presents greater risks.  *See Estate of Romain v. City of Grosse Pointe Farms*, 935 F.3d 485, 492 (6th Cir. 2019) ("When looking for an increased risk, we focus on 'whether [the plaintiff] was safer before the state action than he was after it.'") (quoting *Koulta v. Merciez*, 477 F.3d 442, 445–46 (6th Cir. 2007)).

Finally, the City claims that Plaintiffs have not alleged that the City "knew or should have known that its action *specifically* endangered the Plaintiffs, as opposed to a risk that would affect the public at large."  (Doc. 51 at 35).  This argument is not persuasive, as Policy 12.111 specifically addresses *homeless* encampments, and the Permanent Injunction was issued in response to specific encampments of homeless residents in Cincinnati.  It is self-evident that the City's policy banning people from residing outside with tents or makeshift shelters impacts homeless residents in particular.

In short, the City has not met its burden of proving that Plaintiffs have failed to state a plausible state-created danger claim.  *Bennett v. MIS Corp.*, 607 F.3d 1076, 1091 (6th Cir. 2010); *Treesh*, 487 F.3d at 476.

### G.   Eighth Amendment Cruel and Unusual Punishment

Plaintiffs' third amended complaint alleges that with eleven shelters for approximately 7,740 citizens who will experience homelessness in a given year, "there are never enough beds for everyone in need."  (Doc. 47 at ¶ 123).  Because of this

shortage of shelter space, Plaintiffs assert that "it is cruel and unusual to search, arrest, or imprison someone solely because they are homeless." (*Id.* at ¶ 129). Plaintiffs seek prospective declaratory and injunctive relief to prevent the City from ticketing and prosecuting them in the future for experiencing homelessness.

The City disagrees that there is shortage of shelter space and asks the Court to consider affidavits of shelter and service providers that there is always overflow shelter space available. (Doc. 51 at 29). Because, according to the City, there is adequate shelter space, and because the Permanent Injunction only applies "at all times that space is available in shelters" the City requests that the Court dismiss this claim under Rule 12(b)(6). In addition, the City asserts that because Plaintiffs Phillips and Chin "have never been cited, arrested, or convicted of any crimes as a result of their homelessness status" they lack standing to assert an Eighth Amendment claim. (*Id.*).

The Court will first address the City's contention that Plaintiffs lack standing to bring an Eighth Amendment claim because they have not been cited, arrested, or convicted pursuant to the City's enforcement of its encampment Policy 12.111 or the Permanent Injunction. In support of this argument, the City relies on the Fifth Circuit case, *Johnson v. City of Dallas*, 61 F.3d 442, 444-45 (5th Cir. 1995), in which the court found that the homeless plaintiffs in that case lacked standing to challenge an ordinance prohibiting sleeping in public because they had not been convicted under the ordinance.

The City, in reliance on *Johnson*, erroneously conflates the harm Plaintiffs must allege to state a legally cognizable Eighth Amendment claim and the harm Plaintiffs must allege for purposes of *standing*. *See Bond v. United States*, 564 U.S. 211, 218–19 (2011)

(noting distinction between "legal injury" and "standing" and the common confusion between the two).  To support constitutional standing the relevant question is whether a plaintiff has shown an "injury in fact" defined as "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (alterations and citations omitted).  As explained below, a prior conviction under a statute is relevant to the question of whether there is an imminent risk of future prosecution under that statute, but there is no categorical rule that a plaintiff be convicted in order to have standing to challenge the constitutionality of a statute.

Because Plaintiffs are seeking prospective relief, to demonstrate injury in fact they must show a "substantial risk" that the future harm will occur.  *Kanuszewski v. Mich. HHS*, 927 F.3d 396, 405 (6th Cir. 2019) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).  A lawsuit based on future harm cannot be based on "highly speculative fear," rather, the harm must be "certainly impending."  *Vonderhaar v. Vill. of Evendale*, 906 F.3d 397, 401 (6th Cir. 2018) (quoting *Clapper*, 568 U.S. at 410).  Past exposure to the challenged conduct is relevant to the determination but is neither necessary nor sufficient to demonstrate a risk of imminent future harm.  *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974).  Generally, "one does not have to await the consummation of threatened injury to obtain preventive relief."  *NRA of Am. v. Magaw*, 132 F.3d 272, 286 (6th Cir. 1997) (quoting *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 143 (1974)); *see also Martin*, 920 F.3d at 608–10 (9th Cir. 2019) (finding credible risk of future prosecution under ordinances banning sleeping and camping in

public based on the plaintiffs' continued homelessness and the city's lack of sufficient shelter); *Manning v. Caldwell*, 930 F.3d 264, 270 n.4 (4th Cir. 2019) (en banc); *cf. Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) ("When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'") (quoting *Doe v. Bolton*, 410 U.S. 179, 188 (1973)).

Moreover, where it is difficult or impossible for a plaintiff to conform his behavior to comply with the challenged law, there is a greater likelihood the law will be enforced against him in the future. *See Honig v. Doe*, 484 U.S. 305, 319–20 (1988) (finding "reasonable expectation" that a policy removing disruptive students from classrooms would be applied to plaintiff in the future based on the nature of plaintiff's disability, *i.e.,* his inability to control his behavior) (quoting *Murphy v. Hunt*, 455 U.S. 478, 482 (1978)); *cf. City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) (noting that it is generally assumed that plaintiffs "will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct . . . ."); *O'Shea*, 414 U.S. at 496 (noting easier to show future harm where plaintiff is challenging constitutionality of law he fears will be enforced against him).

Based on the facts alleged in the complaint, Plaintiffs Chin and Phillips have demonstrated an imminent risk of a concrete harm. Policy 12.111 and the Permanent Injunction both direct the police to arrest homeless individuals and to seize their

possessions as a consequence of non-compliance with the policies.  That the alleged harm of criminal prosecution and loss of property is concrete and particularized goes without saying.

Plaintiffs have also demonstrated that the risk of future harm is imminent or "certainly impending."  The City's history of enforcing the policies against Plaintiffs and other homeless residents is relevant here.  The City issued Plaintiff Chin a "trespass warning" notifying him that he would be subject to arrest if he remained at the Fort Washington Camp after 72 hours and proceeded to seize and/or destroy his possessions when he temporarily left the location to do laundry.[15]  (*Id.* at ¶ 52; Doc. 55 at 9).

Both Chin and Phillips resided at the Third Street camp that was forcibly evacuated for a "cleaning" pursuant to Policy 12.111 and then shut down permanently under threat of arrest pursuant to a temporary restraining order applying Ohio's criminal trespass statute and other state law—a precursor to the Permanent Injunction now being challenged.  (Doc. 47 at ¶¶ 51, 52, 66, 73).  In addition, Phillips alleges that he has slept at "upwards of 100" different outside location, but that he has had to abandon those locations because the police forced him to move or be arrested.  (*Id.* at ¶ 51).  Chin similarly asserts that he has been threatened with arrest and regularly confronted and harassed by the police while sleeping outside.  (Doc. 47-1 at 18).

This is not a case where a plaintiff is challenging a generally applicable statute that may or may not be enforced against him.  Policy 12.111 and the Permanent Injunction

---

[15] The City concedes that it issued Chin a trespass warning in its reply brief. (Doc. 55 at 9).

expressly call for the Cincinnati Police to enforce state and local laws *against homeless residents* residing in "illegal encampments"—defined by Policy 12.111 to encompass a single homeless person sleeping outside with a cardboard covering. (Doc. 47-1 at 2). By contrast, in *Lyons*, the Court found imminence lacking where the plaintiff sought to enjoin the police from using chokeholds against him in the future. *Lyons*, 461 U.S. at 105. There, the Court held that plaintiff could establish standing only if he alleged, "(1) 'that *all* police officers in Los Angeles *always*' take the challenged action [of] using unnecessary chokeholds when interacting with 'any citizen with whom they happen to have an encounter,' or (2) 'that the City ordered or authorized police officers to act in such [a] manner.'" *Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 981 (6th Cir. 2020) (emphasis added) (quoting *Lyons*, 461 U.S. at 105–06); *see also Magaw*, 132 F.3d at 283 (finding standing for pre-enforcement challenge to law that specifically targeted the plaintiffs' conduct, stating, "if these provisions of the statute are enforced at all, they will be enforced against these appellants . . . .") (quoting *Navegar, Inc. v. United States*, 103 F.3d 994, 999 (D.C. Cir. 1997)). The City's policies expressly target homeless residents who sleep outside on public property.

This is also not a case where the future enforcement of a law depends upon the speculative assumption that a plaintiff will violate a *valid* criminal law going forward. Here, Plaintiffs are *challenging the validity* of Policy 12.111 and the Permanent Injunction. *See Lyons*, 461 U.S. 95, 103 (1983); *O'Shea*, 414 U.S. at 496. Moreover, accepting as true Plaintiffs' allegations that they are homeless and lack access to shelter,

it is not possible for Plaintiffs to avoid violating Policy 12.111 and the Permanent Injunction.  *See Honig*, 484 U.S. at 319–20.

Requiring Plaintiffs to test enforcement of the law by sleeping in an obvious and open location with a tent, risking arrest, would be antithetical to the general principle that "one does not have to await the consummation of threatened injury to obtain preventive relief."  *Magaw*, 132 F.3d at 286 (quoting *Reg'l Rail Reorganization Act Cases*, 419 U.S. at 143).  That principle is particularly relevant in this case, where Plaintiffs face the dilemma of choosing between sleeping outside with no protection from the elements in compliance with the law or violating the law and facing arrest and the loss of all of their possessions.  *See id.* at 286.

The City argues there is no risk of future injury because there is adequate shelter space and because Policy 12.111 and/or the Permanent Injunction will only to be enforced so long as adequate shelter space is available.  In other words, the City asserts that there is no risk that the policies will be enforced in an unconstitutional manner, such that Plaintiffs will be criminalized for sleeping outside in tents and makeshift shelters when they have nowhere else to go.

The Ninth Circuit in *Martin v. Boise*, considered similar ordinances prohibiting "the use of public property as a temporary or permanent place of dwelling, lodging, or residence" and "occupying, lodging, or sleeping in any building, structure, or public place, whether public or private without the permission of the owner or person entitled to possession or in control thereof."  920 F.3d at 603–04 (alterations and quotations omitted).  Homeless residents brought suit to enjoin the city from prosecuting them under

the ordinances. *Id.* at 604. In reversing the district court's grant of summary judgment in favor of the city, the Ninth Circuit recognized that "the Eighth Amendment's prohibition on cruel and unusual punishment bars a city from prosecuting people criminally for sleeping outside on public property when those people have no home or other shelter to go to." *Id.* at 603. The district court granted the city's motion for summary judgment in part because, after initiation of the lawsuit, both ordinances were amended to instruct that "[l]aw enforcement officers shall not enforce [the ordinances] when the individual is on public property and there is no available overnight shelter." *Id.* at 608 (quotations omitted). Despite the inclusion of this language in the ordinances, the Ninth Circuit reversed the district court and held that the plaintiffs demonstrated a dispute of material fact concerning their standing to seek prospective relief. *Id.*

In reaching its decision, the Ninth Circuit considered statistical evidence presented by the plaintiffs indicating how often the city's shelters were full, and also considered the fact that the city was "wholly reliant" on the shelters to self-report their capacity on a nightly basis. *Id.* at 609. In addition, <u>the court considered evidence demonstrating that even when a shelter has space available, shelter policies, such as caps on the number of consecutive days a person may stay, could result in a person being turned away</u>. *Id.*

This case is not at the summary judgment stage. At the motion to dismiss stage, a court must accept the factual allegation of the complaint as true and "construe the complaint in favor of the complaining party." *Binno v. The Am. Bar Ass'n*, 826 F.3d 338, 344 (6th Cir. 2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). The well-pled allegations contained in Plaintiffs' complaint and their attached affidavits demonstrate a

66

substantial risk that the City will enforce its homeless encampment policies against them when there is, in fact, no shelter space available.

Plaintiffs allege that there is a perpetual shortage of shelter for the homeless in Cincinnati and support this allegation with data from the "Central Access Point" phoneline that individuals may call to determine whether shelter space is available. (Doc. 47 at ¶¶ 25–46). This data, which is reported daily to the Department of Housing and Urban Development, reveals that on an average day during the period spanning from January 2018 to October 2018, a substantial percentage of people were denied access to shelter due to a lack of space, with more individuals denied shelter due to a lack of eligibility. (*Id.* at ¶¶ 27–46). In addition, the executive director of the Greater Cincinnati Homeless Coalition, Joshua Spring, states in his affidavit attached to the complaint that "[o]n an average day in 2018, the known need for shelter is at least double the capacity of [Cincinnati's] shelters"—which does not include people living outside and those who have not yet interacted with an outreach worker. (Doc. 47-1 at 28).

Plaintiffs also allege that shelter rules may preclude a particular person from receiving refuge on a given night, even when space is technically available. (Doc. 47 at ¶¶ 25, 48; Doc. 47-1 at 13–14, 17–19). For example, Phillips explains that he stayed at Shelterhouse on July 2, 2018 but that he was turned away when he tried to return on July 4th, since he failed to stay at Shelterhouse on July 3rd –missing one consecutive day in violation of the shelter's policy. (Doc. 47-1 at 13–14). Even though Phillips explained to the shelter that he failed to appear on July 3rd because he was in the hospital due to a car accident (with documentation), he alleges he was told by a shelter employee that he could

not return for six months.  (*Id.*).  Phillips also alleges that he has tried calling every shelter in Cincinnati only to be denied by each one.  (*Id.*)

Chin has alleged that he stays at shelters "whenever possible," but that shelter space has not always been available.  (*Id.* at 17).  For instance, he has previously stayed at the Catholic Worker House, but was forced to leave because he was unsuccessful in obtaining employment within two weeks of arrival.  (*Id.*).  He was not eligible to return for six months.  (*Id.*).  In addition, Chin states that he has been refused entry to City Gospel Mission at least three times due to lack of space, and that he was banned from returning to Barron Center after he left on one occasion without telling someone where he was going.  (*Id.* at 17–18).

Finally, the City's policies do not appear, on their face, to incorporate a system for determining whether there is shelter space on a particular night or for a particular person. (*See* Doc. 51 at 25).  Policy 12.111 provides that an officer responding to a homeless person sleeping outside with a tent or other form of shelter is to contact a "Neighborhood Liaison Unit" supervisor, who is to then email or fax a copy of the citation to the Greater Cincinnati Homeless Coalition to notify the organization of the location of the homeless person "in need of services."  (Doc. 47-1 at 3–4).  Policy 12.111 does not require the police to verify whether a person has actually been provided shelter prior to returning 72 hours later in order to arrest them.[16]

---

[16] As previously noted, it is not clear whether Cincinnati continues to even adhere to the procedural safeguards provided by Policy 12.111 in light of the subsequent Permanent Injunction.

68

The City's position that there is always shelter space available, (*see* Doc. 51 at 25), demonstrates its disagreement with the facts alleged in the complaint.  The City's request that the Court weigh evidence favorable to it against the copious statistical and testimonial evidence presented by Plaintiffs is inappropriate at this stage.  *See Marks*, 342 F.3d 452.  Accepting the allegations in the complaint as true, Plaintiffs have established a substantial risk that the City will enforce Policy 12.111 and/or the Permanent Injunction in an unconstitutional manner in the future—*i.e.*, when there is no shelter space available.

Plaintiffs also meet the remaining two requirements for standing: "(2)  the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *McGlone v. Bell*, 681 F.3d 718, 729 (6th Cir. 2012) (quoting *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 793 (6th Cir. 2009).  The City of Cincinnati is responsible for enforcing Policy 12.111 and the Permanent Injunction, and a declaratory judgment and injunctive relief prohibiting the City from enforcing those policies would alleviate the risk of arrest and prosecution for sleeping outside when there is no shelter available. Accordingly, Plaintiffs Phillips and Chin have adequately alleged standing to bring their Eighth Amendment claim.

The City does not, at this time, contest that Plaintiffs have adequately alleged a plausible Eighth Amendment claim, *were the policy to be enforced when there is not adequate shelter space available*.  Based on the preceding discussion, Defendant's argument that Plaintiffs must have been cited, arrested, or convicted for Article III standing fails.  Because the Fifth Circuit case the City relies on, *Johnson v. City of*

*Dallas*, confounds the requirements for standing and the substantive requirements of an Eighth Amendment claim, the Court will consider in the alternative whether Plaintiffs need to show a past citation, arrest, or conviction to allege a cognizable Eighth Amendment claim.  This argument goes to the merits of the claim.

The Fifth Circuit held that a conviction is a prerequisite to application of the Eighth Amendment.  *Johnson v. City of Dallas*, 61 F.3d 442, 444–45 (5th Cir. 1995). This Court agrees with the Ninth and Fourth Circuits' approach, that plaintiffs bringing an Eighth Amendment claim on the basis that the state has unconstitutionally exceeded its power to criminalize need not show that they have been convicted, but rather, must allege harm in the form of subjection to the "criminal process."  *Martin*, 920 F.3d at 614; *accord Manning*, 930 F.3d at 284.  This subjection to the criminal process may occur at citation, arrest, or even earlier.[17]  *Jones v. City of Los Angeles*, 444 F.3d 1118, 1129 (9th Cir. 2006), *vacated as a result of settlement*, 505 F.3d 1006 (9th Cir. 2007).  Moreover, in the instant case, Plaintiffs are seeking prospective injunctive relief and thus, they need only allege an imminent risk that they will be subjected to the criminal process. Plaintiffs' allegation that they face imminent citation, arrest, and prosecution under Policy 12.111 and/or the Permanent Injunction is sufficient at this stage to show a risk of future harm that is cognizable for purposes of the Eighth Amendment.

---

[17] Defendants appear to concede that *Johnson* was incorrectly decided, insofar as they agree that a citation or arrest, as opposed to a conviction, would suffice to show harm under the Eighth Amendment.

The Eighth Amendment's Cruel and Unusual Punishments Clause "circumscribes the criminal process in three ways: First, it limits the kinds of punishment that can be imposed on those convicted of crimes; second, it proscribes punishment grossly disproportionate to the severity of the crime; and third, it imposes substantive limits on what can be made criminal and punished as such." *Ingraham v. Wright*, 430 U.S. 651, 667 (1977) (citations omitted). The last limitation, the one at issue in this case, is "to be applied sparingly," as "the primary purpose of the Cruel and Unusual Punishments Clause has always been considered . . . to be directed at the method or kind of punishment imposed for the violation of criminal statutes." *Id.* (alterations omitted) (quoting *Powell v. Texas*, 392 U.S. 514, 531–32 (1968) (plurality opinion)).

In *Ingraham*, the court rejected a claim that corporal punishment in public schools violates the Eighth Amendment, drawing a distinction between state conduct inside and outside the criminal context. *Id.* at 670. In so holding, the court stated in *dicta* that the Cruel and Unusual Punishments Clause "was designed to protect those convicted of crimes," *id.* at 664, and that "the State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law," *Id.* at 671 n.40. It is these statements that the Fifth Circuit in *Johnson* relied on to find that a prior conviction is needed in order to bring an Eighth Amendment claim challenging the state's criminalization of homelessness.

However, it is clear that the Supreme Court's statements relate to the Eighth Amendment's first two limits on state power concerning a state's ability to impose

punishments of certain types and durations. The statements do not relate to the Eighth Amendment's third limit on state power—the substantive limits on what may be criminalized under state law. *See Jones*, 444 F.3d at 1118 (explaining that the Fifth Circuit in *Johnson* misapplied *Ingraham*).

The instant case concerns the Eighth Amendment's third limit on state power. Plaintiffs assert that the City's application of state law via Policy 12.111 and the Permanent Injunction unconstitutionally criminalizes homelessness because there is not enough shelter space available. Therefore, the Eighth Amendment's protection attaches when the City transgresses the "substantive limits on what can be made criminal" by enforcing Policy 12.111 and/or the Permanent Injunction against a homeless resident who does not have access to shelter. *See Ingraham*, 430 U.S. at 667.

In *Martin v. City of Boise*, the city argued, "[r]elying on *Ingraham v. Wright*[,] . . . that the Eighth Amendment, and the Cruel and Unusual Punishments Clause in particular, have no application where there has been no conviction." 920 F.3d at 603. The Ninth Circuit rejected this argument, holding that when a claim is based on the third limit imposed by the Cruel and Unusual Punishments Clause (restricting what a state may criminalize), "a plaintiff need demonstrate only the initiation of the criminal process against him, not a conviction." *Id.* at 614. The court reasoned that to hold otherwise would allow the state to unconstitutionally punish individuals "in the pre-conviction stages of the criminal law enforcement process . . . ." *Id.* (citing *Jones*, 444 F.3d at 1129). Thus, based on the reasoning in *Martin*, a plaintiff has suffered a cognizable harm under the Eighth Amendment's substantive limitation on a state's ability

to criminalize conduct "as soon as he is subjected to the criminal process" which "may begin well before conviction: at arrest; at citation; or even earlier," such as with the initiation of an investigation.  *See Jones*, 444 F.3d at 1129 (citations omitted).

Importantly, the need to show *past* subjection to the criminal process was discussed in *Martin* only in the context of the plaintiffs' request for retrospective relief. There is no such requirement for a claim seeking prospective relief.  920 F.3d at 613–14. Here, Plaintiffs request only prospective declaratory and injunctive relief to prohibit the City from enforcing Policy 12.111 and the Permanent Injunction in a manner that criminalizes them for being homeless.  Thus, Plaintiffs' Eighth Amendment claim is based on this allegation of future harm.  The harm they fear—citation, arrest, and imprisonment—undoubtably constitutes harm that is cognizable under the Cruel and Unusual Punishments Clause's substantive limit on what a state may criminalize.  *See Manning v. Caldwell*, 930 F.3d at 284 (finding claim for prospective relief challenging "habitual drunkard" law cognizable under the Eighth Amendment where plaintiffs alleged "that, as applied to them, the challenged statutory scheme <u>threatens them with arrest and incarceration</u>" for "conduct that is an involuntary manifestation of their illness"—alcoholism).

Even assuming some showing of past subjection to the criminal process were required to bring a cognizable Eighth Amendment claim <u>for prospective relief</u> challenging an application of state law as unconstitutional, both Plaintiffs Chin and Phillips have demonstrated that they have already been "subjected to the criminal process" as a result of the City's allegedly unconstitutional policy criminalizing

homelessness.  The City issued Chin a written warning and seized or destroyed all of his possessions in the Fort Washington Camp eviction.  In addition, Chin and Phillips both allege that they have been forced to move multiple times under threat of arrest by police acting under the authority of the City's policies criminalizing homelessness; and both Plaintiffs allege they do not have access to permanent shelter.  It is again emphasized that Plaintiffs are seeking prospective relief only, and thus, the relevant question is whether they have adequately alleged fear of imminent harm that is cognizable under the Eighth Amendment (*i.e.*, fear of arrest and prosecution).  Accordingly, for the reasons stated above, the Court finds that Plaintiffs have adequately pled an Eighth Amendment claim.

## H.    Right to Travel

Plaintiffs further claim that they have a fundamental right to travel, and that the City's "practice of citing and or arresting Plaintiffs and putative class members for sleeping in public spaces violates their fundamental right to travel by denying them the necessity of a safe place to sleep, rest, and recuperate."  (Doc. 47 at ¶¶ 134, 135).  In *Pottinger v. Miami*, the Southern District of Florida found that Miami's policy of arresting homeless individuals for performing "life-sustaining activities," such as sleeping, lying down, and eating in public, "burden[ed] their right to travel," because without anywhere else to go, the city effectively "denie[d] them a single place where they can be without violating the law."  810 F. Supp. 1551, 1580–81 (S.D. Fla. 1992).  The court further found that the policy had the effect of forcing homeless people to keep moving around in the city or to leave the city entirely to avoid arrest.  *Id.* at 1581.

The City argues this claim should be dismissed to the extent that Plaintiffs "contend they . . . have a right to sleep in public *regardless of available shelter space*." (Doc. 51 at 31). Yet, it is plain based on the allegations in the complaint, and the arguments in Plaintiffs' response brief, that Plaintiffs are challenging the City's enforcement of its homeless encampment policies to the extent that "no shelter space is practically available to those experiencing homelessness" in Cincinnati. (Doc. 53 at 16-17).

The City again seeks to disprove Plaintiffs' allegations that there is insufficient shelter space in Cincinnati with testimonial evidence. This is not a proper basis for dismissal under Rule 12(b)(6). In their reply brief, the City also asserts that Plaintiffs lack standing to bring the right to travel claim, because it is speculative whether the City will enforce its homeless encampment policies against the Plaintiffs when they do not have access to shelter. (Doc. 55 at 14). This argument lacks merit based on the Court's conclusion above that Plaintiffs have adequately alleged a substantial risk that the City will enforce Policy 12.111 and/or the Permanent Injunction when there is no shelter space available.

The City raises a final argument in its reply brief regarding Plaintiffs' right to travel claim—asserting that the right to travel does not encompass the right to "erect structures and large, permanent encampments." (Doc. 14). In addition to the fact that it is generally improper to consider an issue raised for the first time in a reply brief, *see Wright v. Holbrook*, 794 F.2d 1152, 1156 (6th Cir. 1986), the argument is also not persuasive, as "encampment" is not defined in the Permanent Injunction, and the

definition of encampment in Policy 12.111 includes a single homeless person sleeping with a cardboard lean-to.  (Doc. 47-1 at 2).  Consequently, the City has failed to meet its burden of proving that Plaintiffs have not adequately alleged their right to travel claim, or that it the claim fails as a matter of law.  *Treesh*, 487 F.3d at 476.

## I.    Vagueness

Plaintiffs also bring a claim challenging Ohio's criminal trespass statute, Ohio Revised Code ("R.C.") R.C. § 2911.21, as unconstitutionally vague, as "it does not provide adequate notice that one might be subjected to a deprivation of their liberty and property interest for sheltering in a public place."  (Doc. 47 at ¶¶ 160–162).  Defendant asserts that this claim should be dismissed under Federal Rule of Civil Procedure 12(b)(7) for failure to join a necessary party—the Ohio Attorney General.  (Doc. 52 at 36–37).

A claim may be dismissed under Rule 12(b)(7) for "failure to join a party under Rule 19."  Rule 19 in turn provides in pertinent part that "[a] person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (a) in that person's absence, the court cannot accord complete relief among existing parties."  The City asserts that the Ohio Attorney General is a necessary party as "the chief law officer for the state and all its departments," and that complete relief cannot be accorded among the current parties.  (Doc. 51 at 37 (quoting R.C. § 109.02)).

Thus, the Court must first determine whether the state Attorney General is a necessary party.  *See Sch. Dist. of City of Pontiac v. Sec'y of the U.S. Dep't of Educ.*, 584

F.3d 253, 301 (6th Cir. 2009). The fact that the state attorney general is the "chief law officer for the state and its departments" does not automatically make it a proper defendant to a claim challenging the constitutionality of a state statute. *See Children's Healthcare is a Legal Duty v. Deters*, 92 F.3d 1412, 1416 (6th Cir. 1996) ("General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law."); *Putnam v. Davies*, 169 F.R.D. 89, 98 (S.D. Ohio 1998) ("It is well-settled that when a plaintiff seeks to challenge the constitutionality of a state statute, the proper defendant for that suit is the state official or agency that enforced the allegedly unconstitutional statute against the plaintiff."). The City does not assert that the Ohio Attorney General was involved in the enforcement of R.C. § 2911.21 against the Plaintiffs and, therefore, the City has not demonstrated that the Ohio Attorney General is a proper party, let alone a necessary party.

The City's reliance on R.C. § 2721.12 requiring plaintiffs "to provide timely notice to the Attorney General of Ohio of their intent to assail the constitutionality of an Ohio statute" is misplaced. This is a state procedural requirement applicable to lawsuits brought in state court (or possibly cases in federal court based on diversity jurisdiction), which do not impact this Court's jurisdiction. *Bell v. Marinko*, 235 F. Supp. 2d 772, 780 (N.D. Ohio 2002). Notably, although the City asserts that it "is not a proper party," it does not seek dismissal on that basis; rather, it seeks dismissal only for failure to include the state attorney general under Rule 12(b)(7). In addition, the City provides no argumentation or case law to support the assertion that it is not a proper party.

The City further argues in its reply brief that the complaint does not allege facts putting it on notice that the vagueness claim is an "as applied" challenge (as it is characterized by Plaintiffs in their response brief).  Plaintiffs' characterization of the claim as an "as-applied" challenge is supported by the allegations in the complaint.  The complaint does not assert that Ohio's criminal trespass statute is vague in all applications, but rather that it is vague as applied to persons, including Plaintiffs, who seek shelter on public property.  (Doc. 47 at ¶ 162) ("R.C. § 2911.21 is unconstitutionally vague in that it does not provide adequate notice that one might be subjected to a deprivation of their liberty and property interest for sheltering in a public place . . . .").  Plaintiffs also allege in the complaint that "[t]he City cites and arrests citizens experiencing homelessness for criminal trespass on public property pursuant to R.C. § 2911.21."  (*Id.* at ¶ 56).  Consequently, the City has not demonstrated that dismissal of Plaintiffs' vagueness claim is appropriate on the basis of Rule 12(b)(7) for failure to join a necessary party or for giving insufficient notice that this is an as-applied challenge under Rule 12(b)(6).

J.      **Sham Legal Process**

Plaintiffs' third amended complaint brings a state-law claim against the Mayor of Cincinnati under R.C. § 2921.52 for "sham legal process," alleging that the state lawsuit between the County and City resulting in entry of the Permanent Injunction was non-adversarial.  Because the lawsuit was between two friendly parties, Plaintiffs allege that the state court lacked jurisdiction and that the resulting Permanent Injunction was unlawfully issued, constituting a "sham legal process."  (*Id.* at ¶ 163).  Ohio Revised Code § 2921.52 prohibits "using sham legal process."  Sham legal process is defined as

an instrument that is not lawfully issued that purports to be a judgment or order of a court (among other things) and is designed to make another person believe that it is lawfully issued. R.C. § 2921.52(A)(4). The law further provides that:

> (B) No person shall, knowing the sham legal process to be sham legal process, do any of the following:
>
>> (1) Knowingly issue, display, deliver, distribute, or otherwise use sham legal process;
>>
>> (2) Knowingly use sham legal process to arrest, detain, search, or seize any person or the property of another person;
>>
>> (3) Knowingly commit or facilitate the commission of an offense, using sham legal process;
>>
>> (4) Knowingly commit a felony by using sham legal process.

R.C. § 2921.52.

The complaint alleges that the Mayor "asked Defendant Hamilton County Prosecutor to sue the City for failing to abate an alleged nuisance caused by the Third Street Camp" and that "[k]nowing the parties shared a desire to remove the encampment, Defendant Hamilton County Prosecutor nonetheless sought a temporary restraining order and Permanent Injunction against the City to effect that removal without joining the Plaintiffs in this action." (Doc. 47 at ¶ 165). This allegation against the Mayor stems from a press release he issued on August 3, 2018, in which he stated that he "asked for and [] obtained the assistance of Hamilton County Prosecutor Joe Deters," and that "Prosecutor Deters [would] be filing actions in state court." (*Id.* at ¶ 67). Subsequently, on August 6, 2018, the Hamilton County Prosecutor filed a lawsuit against the City of

Cincinnati in state court, which concluded with issuance of the Permanent Injunction prohibiting homeless encampments.  (*Id.* at 68).

The complaint alleges that the Permanent Injunction resulting from this non-adversarial process constitutes a "sham legal process" and that "<u>Defendants' use of the sham legal process</u> caused Plaintiffs to suffer deprivation of their constitutional rights . . . ."  (*Id.* at ¶ 167).

The Mayor asserts that this claim should be dismissed under Rule 12(b)(1) for lack of standing, as Plaintiffs have not sufficiently alleged the "causation" element of standing—that "the injury [is] fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." (Doc. 51 at 38) (citing *Lujan*, 504 U.S. at 560–61).  The Mayor also argues that Plaintiffs have not pled facts with sufficient specificity to support a plausible sham legal process claim against the Mayor.  (*Id.* at 37).  For example, the Mayor asserts that the complaint does not identify what action the Mayor took that would constitute "use" of a sham legal process pursuant to § 2921.52(B).  (*Id.* at 42–43).

The Court agrees that the allegations in the complaint fail to adequately allege that the Mayor *used* the sham legal process (the Permanent Injunction) to harm Plaintiffs. Assuming the facts alleged in the complaint as true, the Mayor encouraged the initiation of a non-adversarial lawsuit that resulted in the state court's issuance of a sham legal process—the Permanent Injunction.  However, § 2921.52(B) states that "No person shall, knowing the sham legal process to be sham legal process . . . (1) Knowingly issue, display, deliver, distribute, <u>or otherwise use sham legal process</u> . . . ."  (emphasis added);

*see Bickerstaff v. Lucarelli*, No. 1:14-cv-831, 2015 WL 1523990, at *5 (N.D. Ohio Apr. 2, 2015) (finding that the plaintiff failed to allege facts making it plausible that the defendant used sham legal process pursuant to § 2921.52(B)). The City's enforcement of the injunction cannot be imputed to the Mayor based on his statement in the press release prior to the issuance of the injunction. Because the complaint does not contain any facts to support a finding that the Mayor used the Permanent Injunction (*i.e.,* was personally involved in its implementation), Plaintiffs have failed to allege a plausible sham legal process claim against the Mayor under Rule 12(b)(6).[18]

## IV. CONCLUSION

Based upon the foregoing, Defendants' motion to dismiss Plaintiffs' third amended complaint (Doc. 51) is **GRANTED in part and DENIED in part** as follows:

1)    Defendants' motion to dismiss is **GRANTED** as to Count I (to the extent Plaintiffs challenge Policy 12.111), Count II, Count V, Count VII, and Count XI; and

2)    Defendants' motion to dismiss is **DENIED** as to Count I (to the extent Plaintiffs challenge the Permanent Injunction), Count III, Count IV, Count VI, Count VIII, Count IX, and Count X. Those claims shall proceed.

---

[18] New Prospect Baptist Church's petition for a writ of prohibition filed in the state court of appeals challenged Judge Ruehlman's jurisdiction to issue the Permanent Injunction on the basis that the lawsuit between the County and City was non-adversarial. *See State of Ohio ex rel. New Prospect Baptist Church*, 2019 WL 6977927, at *2. The state court of appeals rejected this argument, holding that "[o]n the basis of the agreed facts, we hold that the parties to the underlying action had adverse legal interests sufficient to confer jurisdiction on the respondent to resolve a justiciable matter." *Id.* at *3. Because the Court has found that Plaintiffs have failed to state a plausible sham legal process claim under Rule 12(b)(6), the claimed preclusive effect of the state court's ruling need not be addressed by this Court. Moreover, the issue of preclusion has not been raised or briefed by the parties, and it is unclear whether the parties had sufficiently aligned interests to satisfy the privity requirement for collateral estoppel under Ohio law.

**IT IS SO ORDERED.**

Date:  8/13/2020

Timothy S. Black
United States District Judge